IN CLERK'S ...
U.S. DISTRICT COURT E.D.N.Y.
★ FEB 04 2019 ★
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FEDERAL DEFENDERS OF NEW YORK, INC., on behalf of itself and its clients detained at the Metropolitan Detention Center – Brooklyn,

*Plaintiff*,

v.

FEDERAL BUREAU OF PRISONS and WARDEN HERMAN QUAY, in his official capacity,

*Defendants*.

No. _____

CV 19 - 660

BRODIE, J.

GOLD, M.J.

## DECLARATION OF DEIRDRE D. VON DORNUM

I, Deirdre D. von Dornum, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am an attorney duly licensed and admitted to practice law in the State of New York and the United States District Court for the Eastern District of New York.

2. I am the Attorney-in-Charge for the Eastern District of New York at the Federal Defenders of New York, Inc. (the "Federal Defenders").

3. I submit this declaration upon personal knowledge in support of the Federal Defenders' application for a temporary restraining order and preliminary Injunction.

**I.   Fire at the MDC**

4. On Sunday, January 27, 2019, I received an email from Nicole McFarland, an attorney at the Bureau of Prisons ("BOP"), stating that "[t]here will be no visits on Monday January 28 at MDC Brooklyn." That email is attached hereto as Exhibit A.

5. I now understand that the power source for the West Building of the Metropolitan Detention Center ("MDC") caught fire that day.

6. Following the fire, legal visiting at the West Building of the MDC was cancelled each day between January 27 and February 2, 2019, and substantially curtailed on February 3.

7. However, a telephone from which inmates at the MDC could call the offices of the Federal Defenders continued to operate during that period. As a result, throughout the week, during the limited hours they were permitted out of their cells, numerous inmates called our offices to report problems at the MDC. We also heard about the conditions at the facility from inmates brought from the MDC to court.

8. We received calls from men in various housing units in the West Building at MDC reporting that there was little or no heat, no or limited hot water, and no electricity in their units, except for the "emergency lights." Their cells were entirely dark.

9. Inmates reported being denied access to phones, televisions, and computers. The lack of any telephone access except to our office meant that inmates had no means to contact their families or CJA or private lawyers. The lack of computer access meant that inmates have been unable to contact their family members or lawyers by email because they could not access CorrLinks, the BOP's email system. Without CorrLinks, inmates with medical conditions were also unable to refill medications or request medical care.

10. Inmates reported that there was no access to laundry or to commissary. Without commissary, inmates could not purchase stamps to write to their families or lawyers; they could not purchase sweatshirts or thermal underwear; and they could not purchase flashlights or additional food.

11. We also received reports from inmates that they had been smelling noxious fumes, and that they had seen BOP officers wearing masks, but that no masks had been offered to inmates.

12. Throughout that week, my colleagues at the Federal Defenders and I sought to engage with BOP officials so that we could get information about the issues at MDC and the complaints we had received. BOP officials were largely non-responsive to our inquiries, and refused to provide detailed and accurate information about the conditions at MDC or the reasons for the cancellation of legal visiting.

13. On January 28, 2019, Adam Johnson, an attorney at the BOP, replied to an email asking for an update about what was happening at the MDC by stating: "I do not have a lot of details at this time, but I have been informed that the heat is operational and that the inmates are currently out of their cells in the units." That email is attached hereto as Exhibit A.

14. On January 29, 2019, Mr. Johnson informed me and my colleagues that "MDC Brooklyn legal visiting remains suspended today." When asked for additional information, Mr. Johnson reported that there was a "current institutional emergency situation at MDC Brooklyn, which resulted in temporary suspension of legal visitation." When we asked Mr. Johnson for additional information about the fire, and about whether medical treatment was being provided to our clients, Mr. Johnson responded: "To my knowledge, no inmates or staff were injured during the incident, which occurred in an area in which I understand no inmates were present. I have also been informed that the power outage did not impact the heating in the institutions. We will update you once we have more information." That email chain is attached hereto as Exhibit B.

15. I responded to inquire about complaints our office had received from inmates at the MDC, and to ask why visiting, email, social calls, and commissary had reportedly also been cancelled for inmates held in the building at MDC that was not affected by the fire (the East Building). The BOP officials, and attorneys from the United States Attorneys' Offices for the

3

Southern and Eastern Districts, to whom I sent that email never responded. That email chain is attached hereto as Exhibit C.

16. The next day, Wednesday January 30, 2019, Ms. McFarland sent me and my colleagues an email stating that "[t]here will be no west side legal visiting today." That email is attached hereto as Exhibit D.

17. Later that same day, Ms. McFarland sent another email to me and my colleagues: "While I cannot give an exact date for the reopening of the west visiting room, and it will reopen as soon as it is usable, if visitation is not returned to normal by next week, a temporary procedure will be implemented to allow for legal visits to take place in the east visiting room." Ms. McFarland also told us that there would be no legal visits on January 31, and that "[i]f there is any change before next week, I will let everyone know as expeditiously as possible." That email is attached hereto as Exhibit E.

18. The BOP did not provide any update about the status of legal visiting on Thursday January 31 or Friday February 1, 2019. As a result, that Friday, my colleague Michelle Gelernt emailed Ms. McFarland and Mr. Johnson: "We did not receive an update about legal visiting yesterday. Please advise whether legal visiting is suspended today and when and if it will resume." When there was no response, Ms. Gelernt wrote again: "Can someone please respond to my email from earlier this morning? We have not received any updates regarding legal visiting since Wednesday. We need to know whether legal visiting has resumed and, if not, when it is expected to resume." That email chain is attached hereto as Exhibit F.

19. My colleagues at the Federal Defenders and I reported this information, in sum and substance, to the Chief Judges of the Eastern and Southern Districts of New York. We also

4

reported it to individual judges assigned to cases involving inmates held at the MDC or being evaluated for bail or detention at the MDC.

## II.  Response from the Warden of the MDC

20. On February 1, 2019, I learned that Defendant Herman Quay, the Warden of the MDC, had reported to the Southern District of New York about conditions at the facility.

21. Warden Quay reported, in sum and substance:

They had a fire on the 26th that was caused by wiring. As a result, the power from that system was turned off. The power from that system remains off and is being repaired. What this means is there is no power to the outlets which includes lighting in the cells, however the rest of the cell blocks have lights. Inmates have not been confined to their cells and are still allowed leisure/recreational activities. There is currently no TV/Internet. Inmates still have access to Public Defender Phones which are working. Heat has never been impacted and is monitored regularly due to the cold weather. Heat is in the high 60s and low 70s. Hot water has not been impacted as it is on the same system as the heat. There are no problems with meals, prisoner are still receiving hot meals. There is no problem with medical, medications are still delivered twice daily. The only issue related to medication is that the computers are not working so you can not request medical through the computers. Medical still can be requested through their units and also during the twice daily medical runs. The visiting room is without power which is why there was no visitations. The staff has temporary wiring in place and should have attorney visiting up today.

## III.  Inspection of the Conditions at the MDC

22. On February 1, 2019, my office requested that someone from the Federal Defenders be permitted to tour the MDC, but Warden Quay refused.

23. Chief Judge Irizarry then issued an administrative order requiring that I and an employee of the United States Attorney's Office for the Eastern District of New York be permitted access to all housing units in the West Building at MDC and be permitted to speak directly to inmates. A copy of the administrative order is attached hereto as Exhibit G.

24. That day, pursuant to that order, I arranged to meet an employee of the United States Attorney's Office at the MDC. I arrived there at approximately 4:15 p.m.

5

25. When I entered the lobby of the building, I immediately felt the cold. There were BOP officers at a desk in the lobby wearing multiple layers, including scarves wrapped around their heads for warmth. There were lights on in the lobby, but the lighting was dim.

26. I waited in the lobby for John Ross, an investigator from the United States Attorney's Office, to arrive. While I was waiting, a female BOP officer entered the lobby from a door in the rear of the lobby. One of the officers at the desk asked her whether the inmates were receiving meals, and she responded "we are going to let them out one at a time to get their meal, and otherwise lock their asses in."

27. Investigator Ross arrived shortly after I did, and the two of us were admitted into the facility at approximately 4:30 p.m. Throughout our visit, we were escorted by Assistant Warden King, Nicole McFarland from the MDC legal department, and another attorney from MDC's legal department, Holly Pratesi.

28. I requested access to the Special Housing Unit ("SHU") on the ninth floor of the MDC, and to the housing units on the sixth, seventh, and eighth floors of the MDC, because the reports my office received throughout the week suggested that conditions were worse on those floors than on the lower floors.

29. When I arrived at the SHU at the start of the tour, the Lieutenant in that unit, Lieutenant Ramos, explained that the main power conductor for the building had burned down on the evening of Sunday, January 27, 2019.

30. The availability of heat and hot water varied from unit to unit, as did the amount of time inmates reported having been locked down since the fire. But I observed certain conditions that were uniform across all of the housing units I toured.

### A. Conditions Consistent Across All Units

31. Throughout all of the housing units I toured, the lights were not functioning in any individual cells. As a result, the cells were pitch black. It was too dark to read the labels on any medications or to see the food that inmates were given. Inmates reported that when they were locked in their cells they were therefore required to eat in total darkness without being able to see their food when they were locked in their cells.

32. Inmates in each of the housing units I toured reported that they had been unable to obtain refills of any medications they had run out of, because the medical computer system has been down. Although most inmates were continuing to receive medications they had been prescribed, they were not able to request new medical care or refills of existing prescriptions. There were, in addition, several inmates who stated they had not received existing prescriptions, including for psychiatric medications.

33. Administrative grievances are also submitted electronically, on computers. Inmates reported that the computers have been down since the fire. As a result, inmates are unable to submit administrative grievances challenging the conditions of their confinement or raising concerns about the lack of medical care.

34. Inmates in each of the housing units I toured reported that they had not received access to legal or social visitation, to CorrLinks, or to phones (other than the phones that dial directly to the Federal Defenders, as discussed above), at any time since Sunday, January 27, 2019.

35. Inmates in each of the housing units I toured reported that they had not received access to clean clothing or bedding since the fire, and that the commissary had been closed since Friday, January 25, 2019. As a result, inmates have not had the ability to obtain new clothing, or to buy food or stamps. They reported that no extra blankets or clothing had been provided.

7

36. I observed that inmates who had not previously been able to purchase additional clothing from the commissary were wearing only short-sleeved shirts and light cotton pants.

37. Throughout all of the housing units I toured, the inmates I spoke to reported requesting, but not receiving, needed medical care. Particular ailments varied, but I spoke to one inmate who appeared emaciated, reported suffering from Crohn's Disease, and repeatedly asking for, but not receiving medical treatment. Another inmate suffered from ulcerative colitis, and his bedding was bloody but had not been replaced due to the lack of laundry. This same inmate had a swollen leg with an open, infected wound on it. Two inmates reported suffering seizures over the last week, and pressing the emergency button for help, but no one came.

38. Numerous inmates reported being unable to obtain refills of prescribed medications, ranging from medications for psychiatric conditions to antibiotic creams for open, infected wounds. I spoke with multiple inmates suffering from infected wounds that were not being regularly treated. One man showed me a pus-covered bandage on a gunshot wound on his hand, and reported that he had not been able to change his bandages for two weeks.

B. **Conditions in SHU (9th Floor)**

39. The only lighting in the SHU was emergency lighting in the hallways. The cells are pitch black inside, and inmates do not have flashlights. Even the medical room was without lighting.

40. The east side of the SHU was relatively warm – perhaps around 60 degrees Fahrenheit. But the west side (which faces the Upper New York Bay) was significantly colder. I observed that while many inmates on the east side of the building were dressed normally, inmates on the west side appeared to be wrapped in blankets and towels in an effort to keep warm. I tested the water in a shower in an empty cell, and although it never got hot, it did

become tepid after a few minutes. One inmate reported having hot water in the shower in his cell.

41. Lieutenant Ramos reported that no one in the SHU had been allowed out of their cells at all – with the exception of a few cases in which inmates required medical treatment – since Sunday, January 27. Although people held in the SHU typically, by BOP regulation, have access to one hour of recreation outside of the cell per day, that had not been provided since the fire, for reasons he did not specify.

42. Lieutenant Ramos also confirmed that people in the SHU had not received family calls, access to legal visits or calls, or access to laundry or extra blankets. He also reported that although inmates ordinarily receive hot food, the food heater is not functioning due to the lack of electricity. He said that the BOP officers are making efforts to serve food coming up from the kitchen as rapidly as they can, before it grows cold.

43. Some inmates in the SHU reported that water was leaking from the ceiling, from rain or melting snow, and wetting their beds. One inmate reported that a leak over his bed had wet his sheets, and that his cell was so cold that the sheets were freezing. He had no other place to sleep, as the floors of the cells are cold concrete. Lieutenant Ramos confirmed that several cells had ceiling leaks that had not been repaired.

44. Inmates reported that they were suffering from medical issues for which they were not being treated. One inmate reported that he had not received medical care despite suffering from sickle cell anemia. Another inmate reported that he was having difficulty breathing. A third reported that he felt his mental health was degrading because he had been sitting in a dark cell for a week straight.

### C.    Conditions in Eighth Floor Housing Units

45.    When we arrived on the eighth floor, I observed that all of the inmates were locked in their cells. Associate Warden King claimed that this was only because of an ongoing count. (There is a daily 4:00 p.m. count at the MDC.)

46.    The temperature was normal in the common rooms in each of the eighth-floor units that we visited. There was only emergency lighting in the common areas, and no lighting in the cells, which were pitch black.

47.    We were not permitted to enter any of the cells or talk to any of the inmates. I was only able to talk to the orderlies on the unit.

48.    While we were on the eighth floor, Associate Warden King stated to me and Investigator Ross that the inmates had received hot meals every day. The orderlies – who are responsible for serving the food to the other inmates – then stated that today was the first day there had been hot food, and that previously inmates had received only cold food for every meal since the fire. They then looked at Associate Warden King and asked, "are we going to get in trouble for saying that?"

### D.    Conditions in Seventh Floor Housing Units

49.    By the time we arrived on the seventh floor, the count had ended. However, all of the inmates in housing units on the floor were still locked in their cells, with the exception of one unit that was let out of their cells just as our visiting group arrived. Associate Warden King claimed that this was because some of the elevators had been down that morning.

50.    I spoke to many of the inmates through their cell doors. They said that they had been locked in their cells all day, without explanation. Inmates in some units also reported that they had been locked down throughout the prior day, other than when they were temporarily allowed to leave their cells to shower or eat meals.

51. In one of the housing units on this floor, Associate Warden King told me and Investigator Ross that the inmates on the unit had been allowed out of their cells as usual every day since the fire other than February 1. Every inmate on the unit that I spoke with contradicted this. Inmates uniformly – and in multiple different languages – told me that they had been locked into their cells each day since the fire, except for a few hours each morning and afternoon.

52. Associate Warden King again claimed, to me and Investigator Ross, that inmates on the seventh floor had received hot food every day. Inmates, including orderlies who served food, contradicted this report, and informed me that February 1 had been the first day since the fire that any inmates had received hot food.

53. As on the higher floors, there was emergency lighting in the common areas but the lights in individual cells were not working. It was pitch black in the cells.

54. It was also again significantly colder on the side of the building facing the Upper Bay. Inmates on the western side of the building were wrapped head to toe in blankets and towels for warmth. I could feel cold air from the cells blowing out the cracks in cell doors and into the warmer common rooms.

55. Inmates told me that they were not being permitted daily access to showers, and that there was only scant hot water that did not last long enough for everyone to shower. When I tested the water in a shower, it became fairly hot after a few minutes.

E. **Conditions in Sixth Floor Housing Units**

56. On the sixth floor, it was again much colder on the west side of the building. On that side, I could feel cold wind through the cracks in the doors, and the inmates were covered head to toe with blankets and towels. Associate Warden King confirmed that no extra blankets had been supplied, but said she would check the heat when I pointed out the gusts of cold air

coming from the cells. In one of the units on this floor, I noticed that there was cold air actively blowing out of the vents in the cells.

57. Many inmates were wearing multiple layers of clothing – some as many as eight layers. Others did not have enough clothing due to their inability to access the commissary.

58. I noticed an acrid smell on this floor, particularly in the upper tier.

59. The units on the sixth floor had a panicky feeling. Many inmates reported untreated colds and flu, as well as other untreated medical conditions. Many people on this floor told me that they were frustrated that they were being treated like they were in SHU, even though they were pre-trial and had no disciplinary issues.

60. Inmates told me they were upset because they were not being permitted access to the common areas, which at least had functioning emergency lights.

61. Several inmates showed me cups of brown or cloudy water from the tap, and reported that the water was not drinkable. They requested clean water to take medicines.

**F.     Legal Visiting on February 3, 2019**

62. The next day, February 2, I received an email from Nicole McFarland stating "Brooklyn will resume legal visiting tomorrow Sunday February 3. Any questions let me know."

63. Ms. McFarland stated that only legal visits – not social visits – would be permitted "at this time," and provided no answer to the question "Do you expect to have power and lighting for that space?" The email exchange is attached hereto as Exhibit H.

64. On February 3, a number of my colleagues arrived at the MDC. The legal visiting session began later than scheduled. Each lawyer was permitted to see only one client, despite requesting access to several clients each, which is ordinarily permitted.

12

65.     After only a few hours, legal visiting was disrupted for reasons not explained by BOP officials, and the Federal Defenders and other attorneys present were forced to leave the facility.

66.     The BOP has not indicated whether legal visiting will continue to be available in the days and weeks to come.

### IV.    Impact on the Federal Defenders

67.     The Federal Defenders are a non-profit corporation dedicated to offering public defense services to indigent persons in federal criminal cases in the Eastern and Southern Districts of New York.

68.     The recent events at MDC have caused a significant drain on the Federal Defenders' resources. We have been forced to spend significant time attempting to address the issues at MDC, have fielded numerous calls from inmates – both our clients and other individuals detained at MDC – and have spent as much time as we reasonably could attempting to contact counsel for and family members of the individual inmates we have spoken to over the course of the last week.

69.     We have also been stymied from rendering counsel to numerous criminal defendants, because we have been unable to meet with or speak privately to our clients who are housed at MDC, unless they are produced for court appearances. This has impaired our ability to review discovery with clients deciding whether to go to trial – the courthouse cellblock attorney rooms are not set up to permit the passing of documents or the viewing of computer files – as well as our ability to prepare clients for guilty pleas and sentencings. Presentence interviews scheduled to occur at the MDC were all cancelled, which will lead to sentencings being postponed. We had several experts scheduled to evaluate clients at the MDC, which had to be cancelled. Clients being considered for reentry programs, such as substance abuse inpatient

treatment, could not be interviewed and, thus, could not be released to the programs, lengthening their stay at the MDC.

70. Our clients, of course, have also suffered tremendous hardship because of the conditions of confinement at MDC. That hardship is detailed above. Many of our clients have been denied necessary medical care – some for potentially life-threatening conditions. They have been housed in highly restrictive conditions, cells with no light and inadequate heat in the dead of winter. They are not receiving clean clothes, or clean drinking water, or warm meals. And substantially all of our clients held at MDC have been denied legal and social visitation, or indeed any meaningful contact with loved ones.

71. These conditions violate our clients' constitutional rights. And because legal visitation has not been permitted and our clients have been denied access to both communication systems and the BOP's administrative grievance system, there is no meaningful way for them to redress those violations, or the other injuries they have suffered.

72. Absent immediate judicial relief, both the Federal Defenders and the inmates housed at MDC will continue to suffer irreparable harm.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: Brooklyn, New York
February 4, 2019

Deirdre D. von Dornum