# In the
# United States Court of Appeals
# For the Second Circuit

August Term, 2020

(Argued:  February 11, 2020        Decided:  March 20, 2020)

Docket No. 19-1778

FEDERAL DEFENDERS OF NEW YORK, INC., ON BEHALF OF ITSELF AND ITS
CLIENTS DETAINED AT THE METROPOLITAN DETENTION CENTER-BROOKLYN,

*Plaintiff-Appellant,*

–v.–

FEDERAL BUREAU OF PRISONS, WARDEN HERMAN QUAY, IN HIS OFFICIAL
CAPACITY,

*Defendants-Appellees.*

B e f o r e :

WALKER, PARKER, and CARNEY, *Circuit Judges.*

Plaintiff-Appellant the Federal Defenders of New York, Inc. (the "Federal
Defenders" or "Defenders") appeals from a June 4, 2019 judgment of the United States
District Court for the Eastern District of New York (Brodie, *J.*), dismissing the
organization's complaint against Defendants-Appellees the Federal Bureau of Prisons

(the "BOP") and Warden Herman Quay ("Warden Quay") (together, "Defendants"). The Federal Defenders allege that Defendants' curtailment of inmate-attorney visits at the Metropolitan Detention Center-Brooklyn (the "MDC") in early 2019 violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2), and the constitutional right to counsel established by the Sixth Amendment. We conclude that the District Court erred in dismissing the Federal Defenders' APA claim by failing to consider applicable BOP regulations in its zone-of-interests analysis. In its ruling, the District Court also misconstrued the Defenders' Sixth Amendment claim: whereas the Federal Defenders invoke the court's traditional equitable powers in their Sixth Amendment claim against Defendants, the District Court treated this claim as purporting to arise under the Constitution itself. Because the equitable basis of the Federal Defenders' Sixth Amendment claim raises novel questions of constitutional law, we think it prudent to defer ruling on its merits. We therefore vacate the District Court's judgment and remand the cause for further proceedings. In particular, we direct the District Court on remand to consider appointing a master to mediate the parties' differences at the earliest possible time to ensure that the Federal Defenders have meaningful, continuous access to their clients either in person or by remote access pending adjudication of these claims, as these claims may be amended to address similar issues of access arising during the current public health emergency.

VACATED and REMANDED. The mandate shall issue FORTHWITH.

———————

JENNA M. DABBS (Sean Hecker, Joshua Matz, Matthew J. Craig, Benjamin D. White, *on the brief*), Kaplan Hecker & Fink LLP, New York, NY, *for Plaintiff-Appellant*.

SEAN P. GREENE (Varuni Nelson, Rachel G. Balaban, Seth D. Eichenholtz, *on the brief*), *for* Richard P. Donoghue, United States Attorney for the Eastern District of New York, Brooklyn, NY, *for Defendants-Appellees*.

———————

JOHN M. WALKER, JR., BARRINGTON D. PARKER, SUSAN L. CARNEY:

This appeal concerns the severe curtailment of defense attorneys' access to client inmates held at the Metropolitan Detention Center-Brooklyn ("MDC"), most of whom are pretrial detainees who have not been convicted of a crime.

In February 2019, the Federal Defenders of New York, Inc. (the "Federal Defenders" or "Defenders") sued the Federal Bureau of Prisons (the "BOP") and Warden Herman Quay ("Warden Quay") (together, "Defendants"), alleging that their cancellation of inmate-attorney visits at the MDC violates the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2), and the right to counsel established by the Sixth Amendment. The United States District Court for the Eastern District of New York (Brodie, *J.*), dismissed the complaint for failure to state a claim. The District Court held that the Federal Defenders' APA claim did not satisfy the zone-of-interests test and it concluded that the Defenders did not have a cause of action under the Sixth Amendment because the constitutional right to counsel is personal to the accused.

For the reasons set forth below, we VACATE the District Court's judgment. The District Court erred in dismissing the Defenders' APA claim by failing to consider relevant BOP regulations in its zone-of-interests analysis. It also misunderstood the basis of their Sixth Amendment claim: whereas the Federal Defenders bring this claim under the federal courts' inherent equitable powers, the District Court treated the claim as purporting to arise directly under the Sixth Amendment. Because the equitable nature of the claim raises important questions of constitutional law not fully explored by the District Court, we remand the cause for further proceedings on the APA claim and, if necessary, for reconsideration of the Sixth Amendment claim.

**BACKGROUND**

The MDC is the principal federal pretrial detention facility in the Eastern District of New York. It houses more than 1,600 inmates in two buildings located in Brooklyn. The BOP, which administers the nation's federal jail and prison system, oversees and directs operations at the MDC, with Warden Quay superintending the facility during the period relevant to this appeal.

Regulations issued by the BOP govern inmate-attorney visits at the MDC.[1] Under these rules, the Warden is responsible for "set[ting] the time and place" for attorney visitation. 28 C.F.R. § 543.13(b). In doing so, he must "provide the opportunity for pretrial inmate-attorney visits on a seven-days-a-week basis," *id.* at § 551.117(a), and he must "make every effort to arrange for a visit when prior notification is not practical," *id.* at § 543.13(c). In addition, the Warden generally may not restrict the frequency of attorney visits or require these visits to take place outside of normal visitation hours, although he "may make exceptions according to local conditions or for an emergency situation demonstrated by the inmate or visiting attorney." *Id.* at § 543.13(b).

The "standard practice" at the MDC is to allow attorneys to visit detainees from 8 am to 8 pm, seven days per week.[2] Joint App'x ("JA") 11. The Federal Defenders—a

---

[1] Congress has vested the Attorney General with the broad authority to "control and manage[]" federal penal and correctional institutions. 18 U.S.C. § 4001(b)(1). The Attorney General, in turn, has delegated that authority to the federal BOP. *See* 28 C.F.R. § 0.96.

[2] This statement of facts is drawn from the allegations in the complaint, the documents filed by the Federal Defenders in connection with their motion for a temporary restraining order (which were incorporated by reference into the complaint), *see* JA 14, and "matters of which judicial notice may be taken." *S.E.C. v. Apuzzo*, 689 F.3d 204, 207 (2d Cir. 2012) (internal quotation marks omitted).

not-for-profit organization that "is dedicated to offering public defense services to indigent persons in federal criminal cases brought in the Eastern and Southern Districts of New York"—rely on this schedule to visit their clients at the MDC. JA 10.

In January 2019, however, a series of events resulted in a severe curtailment of the Federal Defenders' access to MDC inmates. First, the BOP cancelled or substantially delayed attorney visitation at the MDC during seven days in January, citing staffing issues related to a partial shutdown of the federal government that resulted from a budgetary dispute. Shortly after the government shutdown ended on January 25 and attorney visiting resumed, the BOP again cancelled all inmate-attorney visits at the MDC, effective from January 28 through February 2, this time in response to a fire that started in the MDC's switch gear room on January 27 and caused power outages throughout the facility. Inmate-attorney visits resumed again, temporarily, on February 3, but were then abruptly halted after less than four hours, apparently because of a confrontation between BOP officials and individuals who had assembled in the MDC's lobby.

The Federal Defenders spent "significant time, focus, and resources" in responding to these disruptions in the MDC's schedule for attorney visits. JA 16. During the January government shutdown, for example, the Federal Defenders complained in a contemporaneous letter to BOP officials that the "[l]ast-minute scheduling changes and unexpected closings impose[d] significant burdens on the Defenders and other defense lawyers, particularly those who ha[d] to travel long distances to meet with clients at these facilities, need[ed] to arrange for interpreters or other experts to attend meetings

5

with their clients, or ha[d] a time-sensitive matter to discuss." JA 47.[3] Later, in the wake of the January 27 fire, the Federal Defenders dedicated resources to contacting their clients in the MDC and gathering information about their clients' welfare. After hearing reports that the power outages had deprived many detainees of heating, electricity, hot water, phones, medical care, and other basic services, the Defenders repeatedly requested information from BOP officials on the conditions at the MDC and sought to know the reasons that the facility cancelled visitation. When the BOP "[s]tonewall[ed]" their requests, the Federal Defenders turned to the courts, seeking and securing an administrative order from the District Court (Irizarry, then *C.J.*) that required the BOP to allow the Federal Defenders to inspect the MDC facilities and to speak directly with the inmates. JA 13-14.

In addition to draining the Federal Defenders' resources, the BOP's cancellations and delays of attorney visits impaired the Defenders' ability to represent their clients. During these periods of curtailment, the Federal Defenders could not review discovery files with clients. Nor could they counsel MDC inmates on pleading decisions, trial strategy, or the sentencing process. Disruptions to the visiting schedule also forced the Defenders' attorneys to cancel presentence and expert interviews and to postpone interviews for reentry programs that could have shortened their clients' periods of detention at the MDC.

_____

[3] As noted above, the complaint incorporates the documents submitted by the Federal Defenders in connection with their motion for a temporary restraining order, including their January 22 letter to the BOP.

On February 4, 2019, the Federal Defenders filed this action.[4] In their Complaint, they allege that Defendants' suspension of attorney visitation at the MDC in early 2019 violated the APA (by contravening the BOP's own regulations on inmate-attorney visits) and the Sixth Amendment (by interfering with the right to counsel). The Federal Defenders request injunctive and declaratory relief, primarily in the form of an order requiring Defendants to maintain daily attorney visitation at the MDC.

On the day that the Federal Defenders filed their complaint, the District Court (DeArcy Hall, *J.*) granted their concurrent application for a temporary restraining order (the "TRO"). The TRO required Defendants to reinstate attorney visits "in accordance with the MDC's normal schedule and procedures for such visits." JA 157. Inmate-attorney visitation at the MDC—which had been cancelled again on February 4, 2019, because of a bomb threat—resumed. The District Court (Brodie, *J.*) then scheduled a March 1 hearing date for the Defenders' application for a preliminary injunction, directing the parties to prepare "for oral argument on the issue of whether [the Federal Defenders] ha[ve] standing to bring this action." JA 6.[5]

At the March 1 hearing, the District Court reframed the discussion. The government had opposed the Federal Defenders' motion for a preliminary injunction, arguing that the Defenders lacked standing to sue for the stated violations of legal rights, which (they asserted) belonged to MDC inmates alone. In the District Court's

---

[4] On February 22, 2019, certain MDC inmates acting on behalf of an asserted class filed a separate, but related, action for damages, alleging that in the aftermath of the January 27 fire, BOP officials subjected them to unconstitutional conditions and deprived them of legal counsel. *See* Am. Compl., *Scott v. Quay*, No. 19-cv-1075 (E.D.N.Y. Nov. 15, 2019), ECF No. 29.

[5] Defendants agreed to keep the TRO in effect until the preliminary injunction hearing.

view, however, the central issue was not whether the Federal Defenders had Article III *standing* to bring their claims, but rather whether they could maintain *a cause of action* under the APA or the Sixth Amendment to press for relief. The District Court expressed concern, in particular, about whether the Federal Defenders' claims satisfied the so-called zone-of-interests test—a test developed in case law and holding generally that a plaintiff has no cause of action if his interests lie outside the zone of interests arguably protected or regulated by the law that the plaintiff seeks to invoke. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126-29 (2014). After hearing from both sides, the District Court denied the Federal Defenders' application for a preliminary injunction, concluding that, under the zone-of-interests doctrine, they had failed to state a claim under either the APA or the Sixth Amendment.

The Defenders declined to amend their complaint to address the flaw perceived by the District Court. Instead, they informed the District Court that they would appeal the dismissal of their suit. Accordingly, on May 20, 2019, the District Court dismissed the complaint *sua sponte* for failure to state a claim. *See* Order, *Federal Defs. of N.Y., Inc. v. Fed. Bureau of Prisons*, No. 19-cv-660 (MKB) (E.D.N.Y. May 19, 2019), ECF No. 33 ("Order"). In a brief six-page opinion that reiterated and, to some extent, clarified the court's reasons for denying the Federal Defenders a preliminary injunction on March 1, the District Court set forth its two primary conclusions. First, it ruled that the Defenders have no cause of action under the Sixth Amendment to sue for alleged violations of the right to counsel. This is because, the District Court stated, the constitutional right to counsel is personal to the accused and does not accrue to the Federal Defenders. Second, the Court determined that the Defenders' APA claim does not fall within the zone of interests that Congress sought to protect in 18 U.S.C. § 4001 (which the Federal Defenders identified as the relevant statutory provision at the March 1 hearing) or 18

U.S.C. § 4042 (which the District Court identified, on its own, as potentially relevant).[6] Omitting any mention of the BOP regulations on attorney visitation that the Federal Defenders cited in their complaint, the District Court's decision focused exclusively on statutory sections 4001 and 4042. It concluded that, although these provisions are "broadly worded," they do "not protect [the Defenders'] interest in access to its clients" because the provisions "relate primarily to the health, safety, and well-being of inmates and facility personnel." Order at 6.

This timely appeal followed.

## DISCUSSION

We review *de novo* a district court's *sua sponte* dismissal of a complaint for failure to state a claim. *See J.S. v. T'Kach*, 714 F.3d 99, 103 (2d Cir. 2013). In doing so, we accept as true all well-pled factual allegations in the complaint, drawing all reasonable inferences in favor of the plaintiff. *See Forest Park Pictures v. Universal Television Network, Inc.*, 683 F.3d 424, 429 (2d Cir. 2012).

The Federal Defenders contend that, in dismissing their complaint, the District Court misapplied the zone-of-interests test. With respect to their APA claim, they urge that the District Court erred by failing to consider the BOP regulations that govern inmate-attorney visits. As for their Sixth Amendment claim, the Federal Defenders assert that the zone-of-interests test does not apply to constitutional claims for relief

---

[6] Section 4001 provides, in relevant part, that the Attorney General has rulemaking authority related to "[t]he control and management of Federal penal and correctional institutions, except military or naval institutions." 18 U.S.C. § 4001(b)(1). Section 4042 instructs the BOP to "provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States." *Id.* § 4042(a)(2).

pursued under the court's inherent equitable powers, and that even if the test does apply, their interests in this litigation would satisfy it. Below, we consider these arguments in turn. Before doing so, however, we address Defendants' contention that the Federal Defenders lack Article III standing because the relief they request will not redress their alleged injury. *See Strubel v. Comenity Bank*, 842 F.3d 181, 187 (2d Cir. 2016) ("[B]ecause standing is necessary to our jurisdiction, we are obliged to decide the question at the outset."). If the Defenders do not have Article III standing, we must dismiss for want of jurisdiction. As set forth below, however, we reject this threshold argument.

## I. Redressability

To establish "the irreducible constitutional minimum" of Article III standing, a plaintiff must show: (1) "an injury in fact," (2) "a causal connection between the injury and the conduct complained of," and (3) a likelihood that "the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal quotation marks omitted). Defendants submit that the Federal Defenders' stated injury fails to satisfy the third element: redressability. They contend that, because Defendants reinstated normal visitation schedules at the MDC after this action was filed, the Federal Defenders' alleged injuries constitute "past harms" that cannot be addressed by their request for prospective injunctive and declaratory relief. Appellees' Br. 20.

Under established standing doctrine, however, we evaluate "whether the party invoking jurisdiction had the requisite stake in the outcome *when the suit was filed*." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016) (emphasis added). Thus, if the Federal Defenders' claims satisfy Article III's redressability requirement "as of the outset of litigation," they will continue to do so throughout the litigation. *Klein ex rel.*

*Qlik Techs., Inc. v. Qlik Techs., Inc.*, 906 F.3d 215, 221 (2d Cir. 2018) (internal quotation marks omitted), *cert. dismissed sub nom. Cadian Capital Mgmt., LP v. Klein*, 139 S. Ct. 1406 (2019). Here, the Federal Defenders allege that Defendants continued to interfere with their access to MDC inmates up through the filing of the complaint on February 4, 2019. Taken as true, this allegation establishes that the Federal Defenders' injuries were ongoing when this suit was filed and were therefore amenable at that time to redress by their request for prospective injunctive relief. This is enough to satisfy Article III's redressability requirement.

In arguing that the Federal Defenders' stated injuries are not redressable because the MDC has returned to its normal inmate-attorney visitation schedule, Defendants appear to confuse standing with mootness. While standing doctrine determines whether a plaintiff has a personal stake in the litigation when the complaint is filed, "[m]ootness doctrine determines what to do if an intervening circumstance deprives the plaintiff of a personal stake in the outcome of the lawsuit, at any point during litigation after its initiation." *Id.* at 221 (internal quotation marks and brackets omitted). Defendants, however, "cannot automatically moot [this] case simply by ending [their] unlawful conduct once sued." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013). Instead, they must show that "it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* Although the events of early 2019 were hardly routine, Defendants have not argued—much less demonstrated—that the circumstances that disrupted attorney-client visits at the MDC are unlikely to arise again. Indeed, recent public health-related developments suggest that they are all too likely to recur. *See* Danielle Ivory, *"We Are Not a Hospital": A Prison Braces for the Coronavirus*, N.Y. TIMES (Mar. 18, 2020), https://www.nytimes.com/2020/03/17/us/coronavirus-prisons-jails.html (reporting that the BOP has suspended visits, including most visits by

lawyers, to the federal prison system for 30 days in response to the outbreak of COVID-19). Accordingly, Defendants have not carried their "formidable burden" of demonstrating that intervening events mooted the Federal Defenders' claims. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000).

Defendants also insist that, as a matter of law, the Federal Defenders' claims are not redressable because courts do not have the authority to provide the relief requested. No judge, they contend, "could, as a legal or practical matter, prevent Defendants from taking such actions as they deem necessary in emergency situations to protect those entrusted to their care, including, if necessary, altering the attorney visitation schedule while those emergencies persist." Appellees' Br. 20. In support, Defendants cite several BOP regulations that charge the Warden with developing various detention-facility procedures. *See* 28 C.F.R. §§ 540.40 (regarding inmate visitation by family, friends, and others, and restrictions of such visits when necessary for "security and good order"), 543.10 (affording inmates "reasonable access to legal materials and counsel, and reasonable opportunity to prepare legal documents"), 543.13 (permitting "visits by the retained, appointed, or prospective attorney of an inmate or by an attorney who wishes to interview an inmate as a witness").

This argument is unavailing. Judicial consideration of claims is generally available unless clearly precluded by Congress. *See Webster v. Doe*, 486 U.S. 592, 603 (1988). Here, Defendants do not identify any statute that precludes courts from evaluating the lawfulness of the Warden's conduct, even during emergency situations. The BOP regulations that Defendants reference in their appellate brief merely delegate to the Warden the authority to develop procedures for inmate visitations and access to legal counsel; they do not shield the Warden's conduct from judicial review. Nor are we

persuaded that judicial relief is unavailable as a "practical matter." Appellee's Br. 20. If the Federal Defenders prevail on the merits of this dispute, we see no reason why a court could not grant appropriate relief and order Defendants to conform their conduct to statutory and constitutional law. Even if such an order were to acknowledge the Warden's authority to close a facility in an emergency, it could nevertheless establish the legal boundaries that limit such a closure.

For these reasons, we conclude that the Federal Defenders satisfy the redressability requirement of constitutional standing.

## II.   APA Claim

We next consider whether the District Court correctly dismissed the Federal Defenders' APA claim for failing to satisfy the zone-of-interests test. Under the zone-of-interests doctrine, a plaintiff may state a cause of action only when his interests in the litigation "fall within the zone of interests protected by the law invoked." *Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296, 1302 (2017) (internal quotation marks omitted). Although courts traditionally classified this doctrine as part of "[the] prudential branch of standing," the Supreme Court recently clarified in its *Lexmark* decision that the zone-of-interests test actually determines whether a plaintiff has a right to sue under a particular substantive law, and is not of jurisdictional import. *Lexmark*, 572 U.S. at 126-27 (internal quotation marks omitted). More precisely, the test "requires us to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Bank of Am. Corp.*, 137 S. Ct. at 1303 (citation omitted).

Here, the Federal Defenders sue under the APA, alleging that Defendants failed to comply with the BOP's own regulations on inmate-attorney visits. The APA provides

a civil cause of action to those "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702; *see also Sharkey v. Quarantillo*, 541 F.3d 75, 83-84 (2d Cir. 2008). In doing so, the statute functions as an "omnibus judicial-review provision," permitting "suit[s] for [agency] violations of numerous statutes of varying character that do not themselves include causes of action for judicial review." *Lexmark*, 572 U.S. at 130.

The relevant zone of interests for an APA claim is defined by "the statute that [the plaintiff] says was violated," rather than by the APA itself. *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012) (internal quotation marks omitted); *see also East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 767-68 (9th Cir. 2018). In keeping with "Congress's evident intent when enacting the APA to make agency action presumptively reviewable," the zone-of-interests test is not "especially demanding" in the APA context, as the Supreme Court has explained. *Match-E*, 567 U.S. at 225 (internal quotation marks omitted). The test "forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Id.* (internal quotation marks omitted). The Supreme Court has emphasized, moreover, that an APA claim need only "*arguably*" fall within "the zone of interests to be protected or regulated by the statute that he says was violated," explaining that "the word 'arguably' . . . indicate[s] that the benefit of any doubt goes to the plaintiff." *Id.* at 224-25 (emphasis added) (internal quotation marks omitted).

The Federal Defenders submit that their APA claim satisfies this "lenient" test. *Lexmark*, 572 U.S. at 130. On appeal, they point to three regulatory provisions, adopted by the BOP and published in title 28 of the Code of Federal Regulations, as sheltering

their organization's interests in having frequent and predictable access to clients housed at the MDC. The first, which is codified at section 551.117(a), directs the Warden to "provide the opportunity for pretrial inmate-attorney visits on a seven-days-a-week basis."[7] The second, found in section 543.13(b), sets forth various parameters for scheduling this daily visitation.[8] As relevant to the present appeal, the provision generally prohibits the Warden from "limit[ing] the frequency of attorney visits" or requiring these visits to occur outside of "regular visiting hours," while at the same time empowering the Warden to "make exceptions according to local conditions or for an emergency situation demonstrated by the inmate or visiting attorney." 28 C.F.R. § 543.13(b). Finally, the Federal Defenders highlight section 543.13(c), which directs the Warden to "make every effort to arrange for a[n] [attorney-client] visit," even when the attorney is unable to notify the Warden of the visit in advance.[9]

The District Court did not address these regulations when it dismissed the Federal Defenders' APA claim. Instead, it confined its zone-of-interests analysis to the two statutory provisions mentioned above: 18 U.S.C. § 4001, which generally authorizes

---

[7] *See* 28 C.F.R. § 551.117(a) ("The Warden shall provide the opportunity for pretrial inmate-attorney visits on a seven-days-a-week basis.").

[8] *See* 28 C.F.R. § 543.13(b) ("The Warden generally may not limit the frequency of attorney visits since the number of visits necessary is dependent upon the nature and urgency of the legal problems involved. The Warden shall set the time and place for visits, which ordinarily take place during regular visiting hours. Attorney visits shall take place in a private conference room, if available, or in a regular visiting room in an area and at a time designed to allow a degree of privacy. The Warden may make exceptions according to local conditions or for an emergency situation demonstrated by the inmate or visiting attorney.").

[9] 28 C.F.R. § 543.13(c) ("The attorney shall make an advance appointment for the visit through the Warden prior to each visit; however, the Warden shall make every effort to arrange for a visit when prior notification is not practical.").

the Attorney General to promulgate rules relating to "[t]he control and management of Federal penal and correctional institutions," and 18 U.S.C. § 4042, which entrusts the BOP with, *inter alia*, providing for "the safekeeping, care, and subsistence of all persons charged with . . . offenses against the United States." Although the District Court's written opinion provides no explanation for its decision to focus exclusively on sections 4001 and 4042 of title 18, the transcript of its March 1 preliminary injunction hearing offers some clues to the Court's thinking. In that hearing, the District Court expressed uncertainty about whether it could consider regulations when applying the zone-of-interests test, asking the parties on several occasions whether its inquiry had to be limited to the relevant statutory provisions.

The District Court's hesitation is understandable. We have not addressed in any detail the role that agency regulations might play in the zone-of-interests inquiry.[10] Nor have we explicitly held that a plaintiff may satisfy this doctrine by demonstrating that his interests fall within those protected or regulated by agency rules. Moreover, we can see how, at first blush, agency regulations might be viewed as irrelevant, or even inappropriate, to the zone-of-interests analysis. The core concern of the zone-of-interests doctrine is, after all, whether a plaintiff has a cause of action under the law invoked, *see Lexmark*, 572 U.S. at 126-27, and courts have long recognized that agency regulations cannot themselves "conjure up a private cause of action that has not been authorized by Congress," *Alexander v. Sandoval*, 532 U.S. 275, 291 (2001); *see also Smith v. Dearborn Fin.*

_____

[10] We have identified only one published opinion in which this Court expressly considered agency regulations when applying the zone-of-interests test. In *Acevedo v. Nassau County*, we concluded, in *dicta* and without much discussion, that the plaintiffs failed to satisfy the zone-of-interests test because their interests did not align with, *inter alia*, "[t]he purposes" of certain regulations issued by the General Services Administration. 500 F.2d 1078, 1083 (2d Cir. 1974).

*Servs., Inc.*, 982 F.2d 976, 979 (6th Cir. 1993) ("[F]ederal regulations cannot themselves create a cause of action; that is a function of the legislature.").

Upon closer examination, however, we conclude that agency regulations properly inform the zone-of-interests inquiry in at least two ways. First, agency interpretations of their enabling statutes are among the "traditional tools of statutory interpretation" that the Supreme Court has instructed us to use when defining the zone of interests protected by a given statute. *Bank of Am. Corp.*, 137 S. Ct. at 1303 (internal quotation marks omitted). Recognizing the value that agency expertise can bring to statutory interpretation, courts have developed canons of construction that afford varying degrees of deference to an agency's views of the law that it is charged with administering. *See United States v. Mead Corp.*, 533 U.S. 218, 227-28 (2001) (discussing levels of deference owed to agencies); *see also Greathouse v. JHS Sec. Inc.*, 784 F.3d 105, 113 (2d Cir. 2015) (noting that the "traditional tools of statutory interpretation" include "affording some degree of weight to the interpretations of the agencies charged with enforcing [the statute under review]"). We think that those same canons can help courts apply the zone-of-interests doctrine, given that the related inquiry is, in most cases, simply an exercise in statutory interpretation.[11] Indeed, the Supreme Court signaled as much in *Match-E*, where it looked to agency rules for guidance on whether a plaintiff's APA claim fell within the zone of interests protected by the Indian Reorganization Act, observing that "[these] regulations make [the Act's] statutory concern with land use crystal clear." 567 U.S. at 226.

_____

[11] The parties dispute whether the zone-of-interests test applies to constitutional claims. As discussed below, however, we need not—and do not—reach this question to resolve the Federal Defenders' appeal.

Second, agency regulations are likely to be critical to a correct zone-of-interests analysis where, as here, a plaintiff's APA claim is predicated on an agency's violation of its own regulations. Under deeply rooted principles of administrative law, not to mention common sense, government agencies are generally required to follow their own regulations. *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954) ("*Accardi*") (articulating this principle); *Singh v. DOJ*, 461 F.3d 290, 296 (2d Cir. 2006) (observing that, at least since *Accardi*, "the Supreme Court has held that an administrative agency must adhere to its own regulations"). When agencies fail to do so, the APA (as developed by case law) gives aggrieved parties a cause of action to enforce compliance. *See Webster*, 486 U.S. at 602 n.7 ("[T]he Agency's failure to follow its *own regulations* can be challenged under the APA . . . ." (emphasis in original)); *see also Thomas Brooks Chartered v. Burnett*, 920 F.2d 634, 642 (10th Cir. 1990) ("The failure of an agency to follow its own regulations is challengeable under the APA."); Thomas W. Merrill, *The Accardi Principle*, 74 GEO. WASH. L. REV. 569, 594 (2006) (explaining that the APA provides aggrieved parties with a cause of action to enforce an agency's duty to adhere to its own rules). Importantly, such a cause of action under the APA stands independent of any other right to sue agencies for violations of a statute. It exists to bring an agency's conduct into conformity with "existing valid regulations," not to ensure that an agency's regulations are, themselves, lawful and valid. *Accardi*, 347 U.S. at 268.

We think that our application of the zone-of-interests test must reflect the purpose and contours of this particular APA cause of action for regulatory noncompliance. After all, the test's *raison d'être* is to ascertain "whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Bank of Am. Corp.*, 137 S. Ct. at 1303 (internal quotation marks omitted). Thus, when an aggrieved party

invokes the APA's right to sue an agency for failing to adhere to its own valid regulations, the zone-of-interests inquiry—like the cause of action that it seeks to delineate—should focus on the regulations that were allegedly violated. In such cases, we hold, the applicable zone of interests includes, at a minimum, those protected or regulated by the agency rule that the plaintiff says was violated.[12] This rule ensures that the APA's right to sue agencies for failing to adhere to their own regulations can be exercised by "those who in practice can be expected to police the interests that the statute protects." *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1075 (D.C. Cir. 1998); *see also Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 397 n.12 (1987) (observing that the zone-of-interests inquiry seeks to identify plaintiffs who are "reliable private attorney[s] general" insofar as their suits will "further statutory objectives" rather than "frustrate [them]").

Here, the Federal Defenders' APA claim falls squarely within the zone of interests to be protected and regulated by the three BOP regulations on inmate-attorney visits that Defendants allegedly violated. In bringing this suit, the Federal Defenders

---

[12] Several of our sister circuits have articulated the zone-of-interests test in ways suggesting that a plaintiff may satisfy the test by showing that his interests in the litigation fall within the zone of interests protected or regulated by agency rules. *See, e.g., Busse Broad. Corp. v. F.C.C.*, 87 F.3d 1456, 1463 (D.C. Cir. 1996) (defining the relevant "zone of interests" as those "protected by the underlying statute or regulation [the plaintiffs] accuse the agency of violating" (internal quotation marks omitted)); *accord Kurapati v. U.S. Bureau of Citizenship & Immigration Servs.*, 775 F.3d 1255, 1260 (11th Cir. 2014); *Hayes Int'l Corp. v. McLucas*, 509 F.2d 247, 256 (5th Cir. 1975). Notably, the Tenth Circuit, in *City of Albuquerque v. U.S. Dep't of Interior*, 379 F.3d 901, 915 (10th Cir. 2004), expressly rejected the argument that "standing under the Administrative Procedure Act can only be provided through a statute itself" rather than an "executive order or regulation." *City of Albuquerque* suggests that the APA's provision of a cause of action for those "suffering legal wrong because of agency action" easily applies to parties directly regulated or protected by an executive order or regulation who seek enforcement of that executive order or regulation against an agency. *Id.*

seek to protect their interests in having adequate access to their clients at the MDC. Those interests mirror the interests that these BOP regulations seek to protect, namely: the strong interests of MDC inmates, especially pretrial detainees whose cases have not been adjudicated, in having adequate access to legal counsel. Thus, far from being "marginally related to or inconsistent with the purposes implicit in [these regulations]," *Lexmark*, 572 U.S. at 130 (internal quotation marks omitted), the Defenders' APA claim directly advances the three regulations' plain—and critical—objective of ensuring that detainees have frequent and predictable opportunities to consult with their attorneys.

Defendants do not seriously dispute that the BOP regulations on attorney visitation bear on the zone-of-interests analysis of the Federal Defenders' APA claim. Instead, they assert that the Federal Defenders' interests fall outside the zone of interests protected by these regulations because the BOP intended the regulations to benefit MDC inmates, not their attorneys. We reject this line of argument. As the Federal Defenders correctly observe, the zone-of-interests test does not require an APA plaintiff to be the intended beneficiary of the law that he charges was violated. *See Match-E*, 567 U.S. at 225 ("We do not require any indication of congressional purpose to benefit the would-be plaintiff." (internal quotation marks omitted)). Rather, in the APA context, the test is satisfied where, as here, a plaintiff's interests in the litigation are simply more than "marginally related" to the purposes implicit in the law or regulations invoked. *Id*. The Federal Defenders easily satisfy this standard.

Accordingly, we conclude that the District Court erred in dismissing the Federal

Defenders' APA claim for failure to state a claim under the zone-of-interests test.[13]

### III.    Sixth Amendment Claim

Turning next to the Sixth Amendment claim, the Federal Defenders allege that Defendants' suspension of attorney visitation in early 2019 violated the Sixth Amendment right to counsel. They do not bring this claim under a statute (*e.g.*, the APA). Nor do they assert that they can maintain a cause of action springing directly from the Sixth Amendment. Instead, they invoke "a cause of action in equity" that derives from the judiciary's traditional "equitable power[s]," Defenders' Br. 12, relying in particular on the Supreme Court's decision in *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320 (2015).

In *Armstrong*, certain Medicaid providers sought to enforce section 30(A) of the Medicaid Act, claiming that Idaho's Medicaid plan reimbursed them at rates lower than section 30(A) permitted. *Id.* at 322-23. The plaintiffs asserted that they had "an implied right of action under the Supremacy Clause to seek injunctive relief against the enforcement or implementation of state legislation." *Id.* at 324 (internal quotation marks omitted). The Supreme Court disagreed, however, explaining that the Supremacy Clause is merely "a rule of decision" that "instructs courts [on] what to do when state

_____

[13] Defendants also urge us to reach the merits of the Federal Defenders' APA claim, arguing that "the record fails to support" the complaint's allegations that Defendants acted arbitrarily and capriciously when they curtailed attorney visits at the MDC. Appellees' Br. 12. The District Court did not address this contention, however, and we decline to do so here, especially on a motion to dismiss, where the record is undeveloped and reliance on evidence submitted by Defendants would run afoul of Federal Rule of Civil Procedure 12(d). Instead, we vacate and remand with respect to this claim, following "our settled practice" of allowing the District Court to "address arguments in the first instance." *Farricielli v. Holbrook*, 215 F.3d 241, 246 (2d Cir. 2000).

and federal law clash." *Id.* at 324-25. The Clause "is not the source of any federal rights, and certainly does not create a cause of action," it held. *Id.* at 324-25 (internal quotation marks and citations omitted).

The Supreme Court did not end its inquiry there, however. Instead, it examined whether the plaintiffs' "suit c[ould] proceed against Idaho in equity." *Id.* at 327. The Court explained that a plaintiff may, in certain circumstances, invoke the court's inherent "equitable powers" to "sue to enjoin unconstitutional actions by state and federal officers." *Id.* at 327-28. Such a cause of action "in equity" stands "quite apart from any cause of action conferred by [the Constitution]." *Id.* at 327. Instead, it "is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." *Id.*; *see also id.* at 326-27 (identifying *Osborn v. Bank of United States*, 9 Wheat. 738 (1824), and *Ex parte Young*, 209 U.S. 123 (1908), as suits in equity).

Notwithstanding these deep roots, the precise scope and contours of the court's equitable powers of this nature are ill-defined. *See* Lisa Manheim & Kathryn A. Watts, *Reviewing Presidential Orders*, 86 U. Chi. L. Rev. 1743, 1807-09 (2019). In *Armstrong*, the Supreme Court explained that Congress may expressly or impliedly foreclose pursuit of an equitable cause of action, and it applied this principle to conclude that the Medicaid Act implicitly precluded enforcement of section 30(A) through suits in equity. 575 U.S. at 328. Beyond that, however, the Supreme Court has done little to define the boundaries, if any, that might circumscribe this "judge-made remedy." *Armstrong*, 575 U.S. at 327; *see also* Manheim & Watts, *supra*, at 1809 n.346 (identifying a multitude of questions that *Armstrong* "raises, but does not answer").

The Federal Defenders plunge headlong into these deep and murky waters. Although they describe their Sixth Amendment claim as nothing more than a continuation of "a centuries-old tradition of equity," Defenders' Br. 25, their appeal raises a host of unfamiliar and thorny legal issues. These include, *inter alia*: (1) whether criminal defense attorneys have rights of their own under the Sixth Amendment, independent of those guaranteed to their clients; (2) whether a party without a strictly personal right under the Sixth Amendment can nevertheless invoke a cause of action in equity to sue for Sixth Amendment violations; (3) whether the zone-of-interests test applies to causes of action in equity; (4) whether the judiciary's equitable powers are constrained at all by "the so-called third-party standing bar," a rule of prudential standing that generally prevents "litigants from asserting the rights or legal interests of others simply to obtain relief from injury to themselves," *New York State Citizens' Coal. for Children v. Poole*, 922 F.3d 69, 75 (2d Cir. 2019) (internal quotation marks and brackets omitted); and (5) whether the APA in any way displaces suits in equity.

We are not convinced that the District Court fully appreciated the nature or complexity of the Federal Defenders' Sixth Amendment claim, or the legitimacy of their reliance on *Armstrong* as a basis for pursuing suits in equity. Rather than recognizing that the Defenders frame this claim as one in equity that is separate and distinct from any cause of action conferred by the Constitution, *see Armstrong*, 575 U.S. at 327, the District Court seemed to treat the claim as purporting to arise directly under the Sixth Amendment. As a result, it did not grapple with many of the weighty issues raised by this aspect of the appeal.

To take one example, the District Court reasoned that the Federal Defenders lack "a cause of action under the Sixth Amendment" because the right to counsel belongs

solely to "the accused." Order at 3-4. In reaching this conclusion, the District Court overlooked a narrow but well-drawn line of precedent establishing that a plaintiff may invoke the court's equitable powers to enjoin a defendant from violating constitutional provisions that do not, themselves, grant any legal rights to private plaintiffs. *See, e.g.*, *Armstrong*, 575 U.S. at 324, 327 (recognizing that a plaintiff has a cause of action "in equity" to enforce the Supremacy Clause, even though that clause "is not the source of any federal rights" (internal quotation marks omitted)); *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010) (recognizing that plaintiffs may pursue "Appointments Clause [and] separation-of-powers claim[s]" against a federal regulatory agency, even if they have no "implied private right of action directly under the Constitution").

We decline to address and decide these substantial questions of constitutional law in the first instance. Instead, we vacate judgment as to this claim, and direct the District Court on remand to consider the Defenders' Sixth Amendment action as one in equity under *Armstrong*. Remand "is particularly appropriate" where, as here, "the district court never considered [a theory of the case] . . . and the issue has been given a somewhat cursory and confused treatment [by the parties] on appeal." *United Food & Commercial Workers Union v. CenterMark Props. Meriden Square, Inc.*, 30 F.3d 298, 306-07 (2d Cir. 1994).

Familiar principles of constitutional avoidance further counsel against an appellate decision on the Federal Defenders' Sixth Amendment claim at this early stage of the litigation. "It is axiomatic that the federal courts should, where possible, avoid reaching constitutional questions." *Allstate Ins. Co. v. Serio*, 261 F.3d 143, 149-50 (2d Cir. 2002). We therefore generally refrain from addressing constitutional claims when those

claims would not "entitle [plaintiffs] to relief beyond that to which they were entitled on their statutory claims." *See Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 446 (1988). Here, if the Federal Defenders prevail on their APA claim on remand, it is possible that they will obtain the injunctive and declaratory relief that they request, making it "unnecessary and therefore inappropriate" for a court to decide their Sixth Amendment claim. *Id.* Moreover, as we discuss further below, both parties expressed a willingness at oral argument to consider mediating this dispute. Mediation would enhance the prospect that this litigation can be resolved without a judicial ruling on the novel constitutional issues that it raises.

For these reasons, we defer ruling on the Federal Defenders' Sixth Amendment claim at this time. *See Clinton v. Jones*, 520 U.S. 681, 690 (1997) ("[W]e have often stressed the importance of avoiding the premature adjudication of constitutional questions."). We therefore reinstate this claim and remand it to the District Court for further consideration as necessary.

## CONCLUSION

In this lawsuit, the Federal Defenders have raised claims of the utmost gravity about the lawfulness of the BOP's unilateral curtailment of the ability of pretrial detainees and others confined at the MDC to consult with legal counsel. The right to consult with legal counsel about being released on bond, entering a plea, negotiating and accepting a plea agreement, going to trial, testifying at trial, locating trial witnesses, and other decisions confronting the detained suspect, whose innocence is presumed, is a right inextricably linked to the legitimacy of our criminal justice system. As we have discussed above, the Federal Defenders' assertions that their resources are drained needlessly by the BOP's summary actions give them standing to assert such claims.

Their suit, moreover, is not mooted by the re-initiation of attorney access after the February 2019 fire; rather, the record makes clear that the suspension of legal consultation can be expected to recur. As for the merits of their claims, the Federal Defenders have plausibly alleged violations of the APA, and while we decline to decide at this moment whether they can maintain a cause of action in equity to vindicate violations of the Sixth Amendment, they have raised serious arguments in favor of allowing this claim to proceed as well.

The Defenders describe a course of events that demands the attention of all components of the system that our country relies on for meting out justice. The regulations that the BOP has adopted raise fundamental legal questions about the seriousness—for the whole justice system—of curtailing the right of legal consultation, and the need for stringent oversight of the scope of curtailment and alternatives offered for consultation when some curtailment is reasonably determined to be unavoidable. Curtailment of attorney contact can adversely affect the efficacy of judicial proceedings, which in turn bears directly on the quality of justice received. The judicial branch bears a unique supervisory responsibility for ensuring that the right of legal consultation is not unnecessarily restricted by prison authorities. We therefore take special care in scrutinizing this complaint by the Federal Defenders and the concerns that it reflects.

We recognize, of course, that proper prison management presents daunting challenges. Public safety depends on successful management of those challenges both in ordinary times and in times of emergency; it also depends, however, on maintaining the integrity of the criminal justice system and the public trust in that system. In 2019, the MDC and the BOP faced several different emergencies, requiring adjustments as the BOP carried out its responsibilities: staffing shortages; a fire in an aging facility; a bomb

scare. As we write this opinion, a different and even more dramatic challenge is presented by COVID-19, a novel and easily transmitted viral disease that has prompted a rapid reorientation of workplace practices and social life in support of public health. The impact of this recent emergency on jail and prison inmates, their counsel (in the lead, the Federal Defenders), the United States Attorneys, and the BOP, including the individual Wardens and the personnel of each facility, is just beginning to be felt. Its likely course we cannot foresee. Present information strongly suggests, however, that it may be grave and enduring.

These challenges to prison management implicate statutory and constitutional rights that, as they have been here, are often addressed in the courts. And indeed, the judiciary is well-positioned, usually after the fact, to vindicate such rights. Courts can and must help ensure that constitutional boundaries are not transgressed by considerations of expediency. At the same time, the careful balancing of needs and rights that such emergencies require is likely not best achieved by protracted and contentious litigation after the fact, and certainly not at the appellate level. It requires real-time, comprehensive solutions, reached in cooperative institutional discussions.

In this case, both parties are federal governmental entities: the BOP is an agency within the Department of Justice, and the Federal Defenders are situated in the judicial branch and funded within its budget. Accordingly, at oral argument, we pressed the parties on their openness to mediation and were assured that both the Defenders and the BOP were amenable to pursuing this alternative to litigation. Correspondence received by the Court since oral argument, however, leaves little doubt that the parties have made no progress on this front, and indeed that they have taken no meaningful steps to engage in mediation. The parties point fingers at each other, and it is apparent

that hostility and obstruction, not cooperation, have prevailed. The BOP, in particular, has appeared to be unresponsive to the Defenders' entreaties, perhaps relying on the District Court's rapid dismissal of the underlying action.

We therefore urge in the strongest possible terms that, as soon as the District Court again has jurisdiction over this case, it consider convening the parties to obtain their advice as to the appointment of an individual with the stature, experience, and knowledge necessary to mediate this weighty dispute and ultimately facilitate the adoption of procedures for dealing with ongoing and future emergencies, including the COVID-19 outbreak. Such a person should diligently and speedily work to ensure that those incarcerated at the MDC and those who represent them have access to each other, and that the BOP—while maintaining its ability and authority to manage the facility in a safe way—takes every reasonable step to preserve the statutory and constitutional rights of the inmates and their counsel. We are confident that under wise leadership and guidance, these parties, whose common interest is service to the public, will rise to the occasion and achieve a satisfactory resolution to their permanent credit.

We **VACATE** the District Court's judgment in its entirety and **REMAND** the cause for further proceedings consistent with this opinion. We invite the District Court, to consider its full range of options for efficiently and judiciously resolving this institutional-level dispute. The mandate shall issue **FORTHWITH.**