# EXHIBIT A

# KAPLAN HECKER & FINK LLP

350 FIFTH AVENUE | SUITE 7110
NEW YORK, NEW YORK 10118

TEL (212) 763-0883 | FAX (212) 564-0883
WWW.KAPLANHECKER.COM

DIRECT DIAL 212.763.0889
DIRECT EMAIL shecker@kaplanhecker.com

June 15, 2020

**BY E-MAIL**

Seth D. Eichenholtz
Deputy Chief, Civil Division
U.S. Attorney's Office
Eastern District of New York
271 Cadman Plaza East, 7th Floor
Brooklyn, N.Y. 11201

Jeff Oestericher
Chief, Civil Division
U.S. Attorney's Office
Southern District of New York
One St. Andrew's Plaza
New York, N.Y. 10007

Re: *Federal Defenders of New York, Inc. v. Federal Bureau of Prisons, et al.*, No. 19 Civ. 660 (MKB)

Dear Seth and Jeff:

We write, as you suggested, to provide initial input from Federal Defenders and representatives of the CJA panels in SDNY and EDNY as to how the BOP safely can ensure inmates at the MDC and MCC have meaningful and continuous access to counsel as the BOP considers re-opening in-person legal visitation as early as July 1, 2020, amidst the current public health crisis.

\* \* \*

On our June 11, 2020 joint call with the mediator, as we have on other occasions in recent weeks, the parties discussed what attorney access might look like once the BOP begins to resume in-person legal visiting at the MDC and MCC, which we understand may occur as soon as July 1, 2020. In light of the continued dangers posed to visitors to either facility, the Federal Defenders have been clear that any in-person visitation program must only supplement, rather than replace, a system in which attorneys can access their clients remotely via videoconferences ("VTCs") or teleconferences ("TCs"). Indeed, we strongly disagreed with your prediction to the mediator that the BOP will have no need for a robust VTC system through the end of this year, but we were then

heartened to hear you acknowledge at the June 12, 2020 court conference that you understand that even when in-person legal visiting formally resumes, the BOP will need to continue to meaningfully rely on its VTC system for the foreseeable future.  We were also pleased to hear that the BOP is eager and willing to work with the Federal Defenders, in tandem with the larger defense bar, to ensure that inmates have meaningful, continuous access to their attorneys throughout this period.  We thus write to offer our initial thoughts on certain steps we believe the BOP should take to meet access to counsel needs throughout this challenging period.

As discussed, in the short, medium, and likely long term, meaningful, continuous access can only be ensured through a combination of remote and in-person visitation options.  With that in mind, we see two main areas of immediate concern:  (i) that a reliable and robust system of VTCs be both expanded and locked-in prior to resumption of in-person legal visits, and that that system be *fully* maintained as in-person visits resume; and (ii) that any in-person visiting hours be scheduled and conducted as effectively and as safely as possible.

I.      **Prior to and After the Resumption of In-Person Legal Visiting, the BOP Should Continue and Maintain its Expansion of VTC Access**

As the Federal Defenders have consistently made clear, it is imperative that the BOP continue to expand the availability for attorneys to have remote access to their clients through VTCs.  Although we appreciate the efforts that have been made thus far, as we have noted, we think significant further expansion is warranted.  *See* Dkt. No. 69.  We understand that the BOP both does not believe it is able, nor that demand requires, that it strive towards a system in which VTC access mirrors the extent of in-person legal visiting that was available prior to the COVID-19 pandemic.  Although we would like to further understand why that is the case—especially in light of peer institutions that already have implemented this level of VTC access—we see no reason why the BOP should not commit itself to operationalize as much VTC access as is in fact possible.  We continue to believe that that should be a level of access that closely approximates the hours available in the ordinary course.  We understand that it is the BOP's position that certain other institutions may have an easier time accommodating attorney access.  While we cannot speak to the accuracy of this view, it is beside the point.  Facilities that have large populations of pre-trial detainees, like the MDC and MCC, have a particular need for continuous and reliable access to counsel.  For the reasons we discussed during our joint call with the mediator last week, we do not believe the current number of available hours of VTC access meets that need, particularly as court appearances and arrests begin to increase and are expected to continue to increase in the coming weeks and months.

Further, as we have discussed with the mediator in our joint sessions, the current system of scheduled attorney VTCs and TCs should be integrated as a long-term, and preferably permanent, option at the MDC and MCC.  At the very least, even after in-person legal visiting resumes, a significant number of attorneys at Federal Defenders and on the CJA panels fall into high-risk categories, because of age or underlying health conditions, or because of at-risk family members at home, and will need to be exceedingly cautious about resuming in-person visits.  Moreover, we believe that many interpreters and experts will be unwilling to visit the MDC and MCC for at least the next few months.  This means there will need to be a supply of legal VTCs regularly available for every defendant who has a lawyer in a high-risk category, requires an interpreter, or needs to meet with an expert.  Similarly, for larger legal teams, such as on capital cases, unless there are

KAPLAN HECKER & FINK LLP

3

large spaces that can be made available to accommodate socially distant, confidential visits, a VTC will also be required.

It is worth remembering that this case didn't start with the pandemic. Access to counsel has been a long-standing issue at both institutions, and not-infrequent shutdowns of in-person visiting have been a central problem. Our long-term goal with this mediation is to avoid a return to litigation in our present suit and to avoid new litigation relating to the MCC. We assume that the MDC and MCC would welcome an opportunity to take advantage of the extensive recent work on their parts to ensure that the attorney access clearly mandated by the Second Circuit, and required by the Sixth Amendment, becomes a lasting reality. We look forward to working with you to help resolve any of the operational challenges that stand in the way of building a firmly-entrenched and reliable VTC and TC infrastructure at both facilities.

**II.     The BOP Must Ensure That In-Person Legal Visitation is as Effective and as Safe as Possible When it Resumes**

You have indicated that the BOP plans to resume in-person legal visiting as early as July 1, 2020. While we welcome the resumption of in-person legal visits, it is clear that health risks persist and we are months, if not years, away from the development of a vaccine for the novel coronavirus. Consequently, as the BOP works to further operationalize its VTC capabilities, it should at the same time work to ensure that the in-person visiting it will provide be as safe as possible. You've asked us to propose the steps that we think the BOP should take, and we document our initial thinking below. We recognize that these issues present novel and difficult challenges, and we look forward to continuing to engage with the BOP on them as soon as possible.

*First*, careful consideration should be given to the scheduling of in-person legal visitation hours.

1. Ideally, attorneys would be given appointment times for visits with clients, with a limited number of attorneys scheduled at any one time to allow for social distancing and to permit staff to have the clients available at the scheduled time. As you know (and this is one of the bases of the instant lawsuit), there is a longstanding issue at both MDC and MCC of attorneys having to wait hours to see their clients. We think this waiting time—in public rooms and close proximity to others—needs to be addressed as a public health matter to reduce exposure of both staff and legal visitors to more people than is actually necessary.

2. Further, in combination with scheduled visit times, in order to ease the burden on staff, and prevent issues with separations, we suggest that certain units be scheduled for in-person legal visits on specified days, similar to how social visits work. More visit hours should be allotted to pre-trial units than to cadre units, given the heightened demand for legal access for pre-trial detainees. Of course, any such plan will need to be able to accommodate emergency requests for attorney visits.

3. We ask that both facilities make larger visit spaces available for joint defense meetings or larger legal team meetings to allow for distancing. If visits are scheduled at particular times, this should be feasible. For example, at MCC, the social visiting room could be made available by appointment for capital case teams or joint defense teams to meet. At MDC, the large legal visiting room in the West Building could be reserved.

KAPLAN HECKER & FINK LLP

4

4. We will be able to provide further input on scheduling once we have an understanding of the number of attorney visits that the BOP believes can be accommodated at a time in each facility, based on the available institutional space (in screening areas, waiting areas, visiting rooms, corridors and elevators, as applicable) and consistent with applicable public health guidance.

*Second*, the BOP should take sustained sanitation, hygiene, and social distancing measures so that visitors, inmates, and staff can stay safe as legal visits resume. In the first instance, we offer the following suggestions:

MCC

1. Place hand sanitizer in the front lobby.
2. Ensure that the front lobby bathroom is always equipped with soap, paper towels and hot water.
3. Regularly sanitize (at least every morning before visiting begins) the lobby area, including the lockers, counter surfaces, bathroom, and scanning machines.
4. Allow legal visitors to bring pre-printed legal visit forms to reduce the touching of shared stacks of paper.
5. Permit a limited number of legal visitors in the lobby area at a time to allow for social distancing (the appropriate number of people permitted at any given time to be determined based on available space and in consultation with an independent public health consultant).
6. Provide (or allow defense bar to provide) disposable plastic bags to place personal items (shoes, clothing, legal materials) into before they go through the security belt.
7. Sanitize locker keys and legal visitor tags between each use.
8. Permit legal visitors to keep their shoes on during the screening process or allow the use of foot covers when shoes must be removed.
9. Require staff members who need to touch legal visitors to stamp their hands or do safety screens to either wear fresh gloves or use hand sanitizer before each screening.
10. Disinfect the hand stamp after each use, and permit those attorneys who choose to wear gloves to have the stamp placed on the glove rather than their skin.
11. Permit a limited number of legal visitors in the interior waiting/screening area at a time to allow for social distancing (the appropriate number of people permitted at any given time to be determined based on available space and in consultation with an independent public health consultant).
12. Regularly sanitize (at least every morning before legal visits begin) chairs and surfaces in the inner waiting area.
13. Require everyone—staff, visitors, inmates—to wear masks.
14. Permit legal visitors to wear gloves if they wish, or other PPE.

15. Allow legal visitors to use the stairs to and from the legal visiting room if they wish, rather than the elevators, which are small and present challenges to social distancing.

16. Have hand sanitizer available to legal visitors at the guard desk in the legal visiting room lobby.

17. In the legal visiting rooms, provide tables that are at least 6 feet long so that attorneys and clients can maintain appropriate distancing.

18. In the legal visiting rooms, ensure best practices regarding HVAC, filters and air circulation, to be determined in consultation with a public health expert.

19. Ensure that the legal visiting area is sanitized daily, including doorknobs, doors, tables, chairs, and the bathroom in the legal visiting area.

20. Ensure that only a limited number of people (the appropriate number of people permitted to be determined based on available space and in consultation with an independent public health consultant) ride in an elevator to the SHU at one time.

21. Sanitize all surfaces in the SHU legal visiting rooms daily, including doorknobs, doors, chairs, and buzzer buttons.

22. In the SHU legal visiting rooms, ensure best practices re HVAC, filters and air circulation, to be determined in consultation with a public health expert.

23. Allow for an option for "non-contact" visiting in the SHU for legal visitors with heightened medical concerns.

MDC (both buildings)

1. Place hand sanitizer in the front lobby.

2. Regularly sanitize (at least every morning before visiting begins) the front lobby area, including the front door handles, lockers, counter surfaces, and scanning machines.

3. Sanitize locker keys and legal visitor tags between each use.

4. Allow legal visitors to bring pre-printed legal visit forms to reduce the touching of shared stacks of paper.

5. Permit a limited number of legal visitors at a time in the front lobby area to allow for social distancing (the appropriate number of people permitted at any given time to be determined based on available space and in consultation with an independent public health consultant).

6. Provide (or allow defense bar to provide) disposable plastic bags to place personal items (shoes, clothing, legal materials) into before the items go through the security belt.

7. Permit legal visitors to keep their shoes on during the screening process or allow the use of foot covers when shoes must be removed.

**KAPLAN HECKER & FINK LLP**

6

8. Require staff members who need to touch legal visitors to stamp their hands or do safety screens to either wear fresh gloves or use hand sanitizer before each screening.

9. Disinfect the hand stamp after each use, and permit those attorneys who choose to wear gloves to have the stamp placed on the glove rather than their skin.

10. Permit a limited number of legal visitors at a time in the inner waiting area of the West Building to allow for social distancing (the appropriate number of people permitted at any given time to be determined based on available space and in consultation with an independent public health consultant).

11. Regularly sanitize (at least every morning before legal visits begin) chairs and surfaces in the inner waiting area of the West Building.

12. Require everyone—staff, visitors, inmates—to wear masks.

13. Permit legal visitors to wear gloves if they wish, or other PPE.

14. Have hand sanitizer available to legal visitors at the guard desk in the legal visiting room.

15. In the legal visiting rooms, provide tables that are at least 6 feet long so that attorneys and clients can maintain appropriate distancing.

16. Ensure that the legal visiting area is sanitized daily, including doorknobs, doors, tables, chairs, and the bathroom.

17. In the legal visiting rooms, ensure best practices re HVAC, filters and air circulation, to be determined in consultation with a public health expert.

18. Ensure that only a limited number of people (the appropriate number of people permitted to be determined based on available space and in consultation with an independent public health consultant) ride in the elevator for SHU visits.

19. Sanitize at least every morning before visits begin all high-contact surfaces in the SHU visiting area, including door handles, buzzer buttons, and chairs.

20. In the SHU visiting rooms and the East Building visiting rooms, ensure best practices re HVAC, filters and air circulation, to be determined in consultation with a public health expert.

21. When an attorney is finished with her/his visit and rings the buzzer in the SHU, staff should escort them out of the visiting room as soon as feasible.

We do not view this list as exhaustive, and we look forward to a walk-through of both the MDC and MCC where we can offer further suggestions and recommendations for ensuring that in-person legal visiting be as safe and extensive as possible. We think it may be useful for us or the Bureau of Prisons to retain a public health expert, to the extent you have not already done so in connection with current protocols for staff and inmates, to help advise on these issues, including as specifically noted above, and to undertake periodic inspections of compliance with the safety measures for legal access.

**KAPLAN HECKER & FINK LLP**

      We look forward to working with you in a collaborative manner to ensure that attorneys have meaningful, continuous, and safe access to their clients at the MDC and MCC.

                                                              Very truly yours,

                                                              Sean Hecker
                                                               Jenna M. Dabbs

cc:    Loretta E. Lynch, Paul, Weiss, Rifkind, Wharton & Garrison LLP
         Roberto Finzi, Paul, Weiss, Rifkind, Wharton & Garrison LLP
         Tony Joe, Paul, Weiss, Rifkind, Wharton & Garrison LLP
         Sean Greene, U.S. Attorney's Office (E.D.N.Y.)
         David Jones, U.S. Attorney's Office (S.D.N.Y.)
         Holly Pratesi, Federal Bureau of Prisons
         Nicole McFarland, Federal Bureau of Prisons