

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

July 17, 2020

**By ECF**
The Honorable Margo K. Brodie
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: *Federal Defenders of NY, Inc. v. Federal Bureau of Prisons, et al.*
Civil Docket No. 19-cv-660 (Brodie, J.)(Gold, M.J.)

Dear Judge Brodie:

This Office represents Defendants Federal Bureau of Prisons ("BOP") and the Warden of the Metropolitan Detention Center in Brooklyn, New York ("MDC") in the above-referenced matter. In connection with Defendants' request during the July 10, 2020 status conference, we write to further detail the Government's objections to the Court's order (the "July 10 Order") requiring Defendants to provide "evening hours at the MDC for legal calls until the backlog of requests has been eliminated." ECF Minute Entry dated July 10, 2020. Primarily, Defendants object to the July 10 Order because they have addressed, and have committed to continue addressing, legal access needs at the MDC, including any excess of call requests that may arise, without the need of a Court order. Further, Defendants believe the evidence supports their position that the parties, through the mediation process, are successfully managing any backlog of requests. Lastly, as the parties continue in good faith to address these and other issues in mediation, Defendants respectfully submit that the Court should not issue any order of this type, absent a recommendation from the mediator following notice to the parties, a legally sufficient showing by Plaintiff that it is entitled to such an order, and a full opportunity for Defendants to be heard.

At the outset, we reiterate that, in recognition of the importance of providing legal access as quickly as possible, Defendants were already voluntarily providing the evening call hours that are the subject of the July 10 Order at the time the order was issued. Defendants were unable only to assure the Court that those specific hours would continue in perpetuity, because staffing and institutional needs could change. Nevertheless, Defendants were able to represent that, even in the absence of evening hours in the future, the MDC would provide equivalent legal access to guard against a significant backlog of call requests. Given these assurances, and Defendants' demonstrated commitment to resolving any issues that arise through mediation as detailed below, Defendants respectfully submit that no Court order is necessary. Consequently, the Court should vacate the July 10 Order. In the alternative, it should decline to extend the order past July 24.

**A. MDC is Successfully Balancing the Need for Legal Access with the Safe and Orderly Operation of the Institution**

During the July 10, 2020 conference in this matter, the Court expressed concern about a number of calls that had not been placed within 48 hours of a request. This concern has its origins in the early days of this litigation, when Plaintiff sought a court order requiring MDC to place all requested legal calls within 48 hours. ECF Docket Nos. 45 & 49. While the Court denied that request, the Court since has sought to ensure that all requested calls be placed within 48 hours. ECF Minute Entries dated April 3 and April 10, 2020. However, as explained in more detail below, the mere existence of a limited number of calls not placed within 48 hours does not indicate that MDC is not providing meaningful legal access. Moreover, as of Monday, July 13, there was only ***one telephone call request*** at MDC that was sought within 48 hours and had not yet been placed. Thus, even relying on this metric, the true number of excess requests is not indicative of a failure on the part of MDC requiring the remedy of a Court order, but rather, a success.

1. MDC's Efforts to Provide Legal Access During the COVID-19 Pandemic

By way of background, at this time a year ago, in July and August 2019, 22 attorneys each day sought legal visits at MDC, on average. Attorneys were taken to large visiting rooms in the institution that could be staffed by between two and four correctional officers (depending on the size of the demand that day), and multiple visits could be accommodated at one time. In March 2020, the COVID-19 pandemic suddenly forced a change to legal access at MDC, requiring the rapid deployment of alternatives to in-person visitation while the MDC and BOP struggled to adapt—along with the rest of the city and country—to changes wrought by the virus to the lives of its employees and its methods of achieving its mission. Working with Plaintiff and the courts, by early April, MDC put into place a system for providing telephone calls for both inmate court appearances and attorney calls. While MDC staff initially scheduled and, where necessary, triaged these call requests, the Federal Defenders subsequently took charge of this responsibility, over the Government's objection.

This new call system was a resource-intensive effort on the part of MDC. Whereas in-person visitation requires a handful of staff members to facilitate the average of 22 attorney-visitors each day, the new call system required a staff member to escort each individual inmate for the duration of his/her telephone call. Since MDC initially committed to providing up to six hours of court calls and six hours of attorney-client calls each day on each of its six floors, the system required MDC to commit staff to cover 72 hours of one-on-one staff-to-inmate supervision to facilitate these calls. Additionally, staff was dedicated to the scheduling and tracking of these calls, and the prison's Legal Department spent approximately 50 percent of its time on training and troubleshooting related to this new system.

It is important to note that all of this work was taking place during a time when MDC was also undertaking extensive, and thus far successful, efforts to prevent the spread of COVID-19 within the institution, all the while defending demanding, putative class-action litigation brought under the hasty and unsupported assumption that MDC would fail in this endeavor. *See Chunn v. Edge*, 20-CV-1590 (RPK)(RLM), ___ F.3d ___, 2020 WL 3055669 (E.D.N.Y. June 9, 2020) (describing MDC's efforts to mitigate the spread of COVID-19 among the inmates and staff). The

legal access system MDC developed and implemented had to operate under the limitations imposed by these infection mitigation efforts, including the requirement to separate inmates from different units and to accommodate those inmates placed on quarantine and isolation status.[1]

Plaintiff insisted that the amount of legal access facilitated by MDC at this point was insufficient and needed to be expanded. Even where Defendants disagreed on specific numbers, they have continually worked through the mediation process and responded to Plaintiff's concerns by expanding access for both telephone calls and videoteleconferences ("VTCs"). Whereas initially, MDC provided 36 30-minute legal calls each weekday, and up to 10 hours of VTCs (which, at the time, required the attorney to travel to the EDNY courthouse) each week, MDC gradually has expanded these offerings to the point where it now offers **88 call slots, or 44 hours, of legal call access per day**.

In addition to this capacity, as always, inmates continue to have access to dedicated Federal Defenders telephone lines in the common areas of their housing units to make outgoing calls to their attorneys. Further, MDC has expanded its VTC offerings to provide approximately 36 hours of VTC access per week.

2. <u>BOP Has Maximized Use of its Strained Resources</u>

BOP was able to provide the expanded capacity described above by, among other things, detailing staff from other facilities. It is worth noting what that means (and continues to mean)—BOP has ordered staff working throughout the country to come to MDC for the sole purpose of facilitating legal visitation. In April and May, this often involved ordering staff from areas of the country that were not affected by COVID-19 to leave their families and travel to what was, at the time, the epicenter of the pandemic. As evidenced by these difficult decisions, BOP is committed to ensuring sufficient staffing and maximizing legal access at the MDC even when doing so creates significant hardships. That said, there may be periods, as there was earlier this month, when those hardships give rise to unavoidable staffing issues that result in the temporary reduction of certain hours of access. As it did when that happened, MDC will continue to work to restore capacity, and resolve any temporary resulting overflow, as quickly as possible.

**B. While MDC Works to Maximize Legal Call Capacity, the Court Should Not Rely on the Number of Calls Not Placed within 48 Hours as the Sole Measure of Success**

1. The Current Number of Excess Requests at MDC Represents a Tiny Fraction of <u>Call Requests</u>

Since May 19, Plaintiff has reported that they have received 3,715 requests for legal access at MDC. This averages out to 88 attorney requests for legal access each day—four times the number of attorney visits that took place on an average day in July 2019. The weeks of June 29 and July 6 had an especially heavy volume of requests, averaging 105 attorneys requesting access each day during this period—just under five times the number of attorneys who visited on an

[1] Despite some early allegations to the contrary, MDC facilitated legal access even for those individuals in isolation status. *See* ECF Docket Nos. 52 & 56.

average day in July 2019. The demand has reverted to the mean this week; over the past four days, requests for access have numbered 73, 88, 63, and 80, respectively. This pattern is typical of demand throughout the pandemic—some days have heavy demand (105 requests on June 8, for example) and other days have below-average demand (58 requests on June 28, for example). As such, the ability to place each and every call expeditiously ebbs and flows along with demand.

The number of calls that are placed more than 48 hours after a request is not as substantial as Plaintiff claims. As of Monday, July 13, there were only nine telephone call requests that had not yet been scheduled within 48 hours (and as discussed below, only one request where the attorney did not express that the call could be scheduled this week).[2] Defendants respectfully submit that this limited number of excess requests, when Plaintiff receives an average of 88 requests *each day*, is indicative of MDC and the parties' success, not MDC's failure, as suggested during the July 10 conference.

2. The Existence of Excess Requests, Taken Alone, Is an Unreliable Indicator of Performance

Moreover, relying solely on the "48-hour backlog" count does not accurately reflect MDC's efforts in providing legal access for several reasons. As an initial matter, not every attorney requesting a legal call even wants the call placed within 48 hours. Indeed, of the nine telephone call requests designated by Plaintiff as "backlog," all but one of the requests were ones in which the *requesting attorney* sought a call outside of the 48-hour window by a deadline that had not yet passed. Removing these calls from the analysis makes clear MDC's success: as of Monday, just after the Court issued its order, there was only **one request** where an attorney sought a call within the 48-hour time frame and had not yet received it.[3]

Second, as Plaintiff agrees, not all legal call requests are equal in terms of their urgency or content. For example, based on correspondence with requesting counsel, MDC has learned that some calls are requested to convey information of a non-legal, personal nature, or to check on the wellbeing of a family member. Also, as noted in Defendants' most recent status letter, Defendants discovered that Plaintiff gave one of the recent call slots to a person who requested a legal call, but was in fact on the inmate's social visiting list.[4] The 48-hour metric is also deceptive because it reflects, in part, scheduling decisions made by Plaintiff. For example, Plaintiff has, from time to

[2] Plaintiff alleges a backlog of 31 calls at MDC as of Monday. However, only nine of these are telephone call requests. The remaining requests on Plaintiff's list are requests for VTCs. Of these, 10 are requests where *the attorney* indicated the VTC needed to occur by a date this week *or later*. The other 12 were requested as soon as possible. MDC has consistently facilitated requests for urgent VTCs.

[3] Defendants were unable to provide this information to the Court last Friday because Plaintiff had never before provided data about when the requesting attorney sought a legal call. Defendants had never sought this information because their focus was not litigating these facts, but rather, the practical issues involved in continuing to provide as much legal access as possible.

[4] Inmates have access to social calls and the e-mail system up to three hours per day, seven days a week.


time, used multiple slots for one attorney-client communication or provided a number of slots over the course of the week to one attorney for one client. Defendants understand that some calls need to be lengthy and have deferred to Plaintiff on these scheduling issues, even when Plaintiff's scheduling takes up multiple call spots and pushes other call requests into the overflow category.

Defendants finally note that they have facilitated additional, urgent legal calls, regardless of "backlog" status, through a scheduling process outside of the standard scheduling system that has proved successful in meeting demand. Looking exclusively at the existence of excess requests also obscures these efforts. This week, MDC received and accommodated five such urgent requests, and will continue to do so, even when requests are made last-minute.

In sum, Defendants respectfully submit that, when assessing MDC's performance, rather than looking solely at a whether a small fraction of calls, for various reasons, are placed more than 48 hours after they are requested, the Court should look to MDC's consistent (and often creative) expansion of capacity and its continuing work with the mediator in good faith.

### C. The July 10 Order Runs Counter to the Ongoing Mediation Process

The parties have achieved success working through the mediation process, which, unlike a court order, relies on the consent of the parties to achieve its goals. Defendants respectfully submit that the July 10 Order works at cross-purposes with the mediation process.

In urging this Court to convene the parties to mediate their dispute and devise a plan that could provide for the maintenance of legal access during an emergency, the Second Circuit encouraged the parties to employ the "wise leadership and guidance" "of an individual with the stature, experience, and knowledge necessary" to guide them in the process. *Federal Defenders of N.Y., Inc. v. Federal Bureau of Prisons*, 954 F.3d 118, 136 (2d Cir. 2020). The Circuit explicitly noted its preference that a resolution be reached through the collaborative efforts of the parties and the mediator rather than litigation. *See id.* at 135-36. As intended by the Circuit, Defendants have worked closely with the mediator for the past four months to address issues raised by the parties and have implemented expanded telephonic and VTC access at the MDC. Indeed, at the July 10 status conference, the mediator, who has the relevant data at her disposal, explained that the issue of overflow calls was being discussed and the parties were "working on ways to try to balance the system to work to accommodate [them]." July 10 Conf. Tr. 5:19-6:21.

Defendants have committed to this process, even as they confront unprecedented challenges in the delivery of services to inmates in their care, because they recognize the importance of the issues raised in this litigation. They also recognized the principal benefit of mediation—avoiding litigation. But the Government's consent was premised on the express understanding that any orders would issue only after a recommendation from the mediator, following notice to the parties, and only after the parties have had a full and fair opportunity to be heard on the legal and factual merits of the order. The mediator has made no recommendation that the Court issue any order here. Moreover, defending against orders issued on top of, and not as a result of, the mediation process, forces Defendants to engage in the very litigation all parties sought to avoid through mediation.

Additionally, ordering Defendants to provide legal access in specific ways and at specific times ventures onto shaky legal ground for a number of reasons. First, any order of this type is, in essence, an award of de facto injunctive relief without permitting Defendants the opportunity to move against the Complaint, brief the issues, participate in a hearing or otherwise submit evidence required to determine the necessity of emergency relief. Such an order is also inappropriate because it excuses Plaintiff from showing the *sine qua non* for establishing entitlement to emergency relief—that the relief is necessary to prevent irreparable harm. Indeed, courts in this district have found that allegations of lack of telephone access to counsel, without more, fail to show the irreparable harm required for emergency injunctive relief. *See, e.g.*, *Malki v. Hayes*, No. 11-CV-5909, 2012 WL 32611, at *1 (E.D.N.Y. Jan. 5, 2012) (Townes, J.) (denying temporary restraining order in connection with allegations of 90-day suspension of telephone privileges, even for legal calls, on ground that the plaintiff "failed to adduce any evidence suggesting immediate, irreparable harm"). Further, an order implicitly assumes that Plaintiff has shown (or is likely to prevail on its claim of) a constitutional violation on the unprecedented basis that some inmates had not received a call within 48 hours of a request, no matter the reasons for, or the length of, the delay. Such an implicit finding is contrary to Supreme Court precedent, which requires a balancing of inmates' constitutional rights with the necessities of prison administration, and the "wide-ranging deference" accorded prison administrators. *Bell v. Wolfish,* 441 U.S. 520, 546-47 (1979). Moreover, the *de minimus* amount of true overflow, as shown above, together with Plaintiff's failure to allege any actual impact on a pending criminal matter, means that Plaintiff *cannot* establish irreparable harm.

Finally, the July 10 Order implicates core separation-of-powers concerns. Plaintiff has brought constitutional and statutory claims related to the alleged arbitrary closure of the MDC to attorney visits for one week last year. The Court's inherent authority with respect to this case does not extend to issuing orders—particularly in the midst of a pre-Answer mediation conducted by a court-appointed mediator—for relief that is not limited to preventing ongoing or imminent and irreparable constitutional injury, but rather, is fashioned in Plaintiff's, or even the Court's, view of how *best* to run the prison's operations. To hold otherwise would be to assume the role of the Executive to determine, in the first instance, how to confront issues related to the BOP's core mission, and without the benefit of a record—outside of allegations lodged during mediation—on which to so hold.

**D. Conclusion**

In sum, for the reasons set forth above, the Court should vacate the portion of the July 10 Order requiring Defendants to provide evening hour calls. In the alternative, the Court should decline to extend the order beyond July 24.

We thank the Court for its consideration of this matter.

Respectfully submitted,

SETH D. DUCHARME
Acting United States Attorney

By: /s/
Seth D. Eichenholtz
Sean P. Greene
Matthew J. Modafferi
Assistant U.S. Attorneys
718-254-7036/6484/6229
seth.eichenholtz@usdoj.gov
sean.greene@usdoj.gov
matthew.modafferi@usdoj.gov

cc: Counsel of Record (ECF)

Jeffrey Oestericher
David Jones
Assistant U.S. Attorneys, S.D.N.Y.

Loretta E. Lynch
Roberto Finzi
Tony Joe
Paul, Weiss, Rifkind, Wharton & Garrison LLP