**KAPLAN HECKER & FINK LLP**

350 FIFTH AVENUE | 63RD FLOOR
NEW YORK, NEW YORK 10118

1050 K STREET NW | SUITE 1040
WASHINGTON, DC 20001

TEL (212) 763-0883 | FAX (212) 564-0883

WWW.KAPLANHECKER.COM

DIRECT DIAL   212.763.0883
DIRECT EMAIL  shecker@kaplanhecker.com

July 17, 2022

**BY ECF**

The Honorable Margo K. Brodie
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

      Re:    *Federal Defenders of New York, Inc. v. Federal Bureau of Prisons, et al.*, No. 19 Civ. 660 (MKB)

Dear Chief Judge Brodie:

      We write on behalf of the Federal Defenders to provide an urgent update regarding the ongoing deterioration of legal access at MDC Brooklyn.

      As Plaintiff has reported in recent status letters, issues with legal access at MDC persist; indeed, they appear to be getting worse. On May 18, 2022, the Federal Defenders reported that miscommunications between MDC Legal and staff, particularly officers in the front lobby and visiting rooms, were causing "the cancellation of many legal visits, VTCs, and phone calls." ECF No. 324. On June 1, 2022, the Federal Defenders recounted an incident in which a legal department paralegal withheld a VTC because the client was having an "attitude." ECF No. 328. On June 15, 2022, Plaintiff reported that the MDC had experienced several lockdowns, which often resulted in the MDC fully cancelling legal visits and remote legal access. ECF No. 330. And on July 6, 2022, the Federal Defenders described how a mitigation specialist had attempted to visit a client in SHU, waited for two hours in a locked room with her calls for help going unanswered, until she eventually left without seeing her client. ECF No. 334. In between each of these status letters, Plaintiff has reported to the mediation team, the government, and MDC Legal frequent additional issues with legal access, particularly in-person visiting.

      On Friday, July 15, 2022, MDC's interference with legal access reached new heights. That day, several attorneys found themselves trapped in the visiting room during an undefined emergency lockdown—with no ability to leave (despite staff moving about freely), speak to MDC Legal, speak to the Warden, or call family regarding urgent childcare obligations. This incident not only raises serious questions about clients' Sixth Amendment rights, but also the constitutional

KAPLAN HECKER & FINK LLP

2

rights of the attorneys, including Fourth Amendment violations for false arrest and illegal seizure, as well as intentional or negligent infliction of emotional distress.

Five attorneys were detained in the West visiting room, including Grainne O'Neill, Steven Legon, Henry Mazurek, Priya Pasricha, and an as-yet-unidentified lawyer. The attorneys arrived at various times between 9:30 am and 11:15 am and had to wait up to an hour for their clients to be brought to the visiting room. As the lawyers were meeting with their clients in the visiting rooms, at approximately 1:00 pm, an officer explained that there had to be an emergency count, and the attorneys would not be able to leave for 45 minutes to an hour. Even though one attorney, Steven Legon, explained that he had concluded his client visit, the officer refused to let him leave at that point. Around 2:00 pm, Mr. Legon asked the visiting room desk officer when they expected the count would be cleared. Mr. Legon explained to the front desk officer that he had childcare obligations that afternoon; he was told that the count should be cleared within 30 minutes. Some time later, Mr. Legon again asked the front desk officer—this time, a different officer—when the count would be cleared. Having watched the prior visiting room desk officer freely leave the visiting room and exit the sallyport toward the front lobby, apparently finished with his shift for the day, the attorney asked why the lawyers were not permitted to leave, while officers continued to come and go as usual. This new visiting room officer stated that the emergency lockdown only applied to inmates and visitors, not staff. After Mr. Legon once again explained that he had to leave to pick up his 8-year-old son from his day camp bus stop, and that his wife would be extremely worried if he did not contact her or if she received a phone call from the day camp that their son did not get picked up, the officer responded that there was nothing he could do and that the childcare issue was not his problem.

Mr. Legon then conferred with Ms. O'Neill, because he had heard her raising concerns about similar childcare issues. The two attorneys approached the visiting room desk and asked to make a telephone call outside of the facility to make childcare arrangements. Ms. O'Neill explained that she, like Mr. Legon, needed to pick up her young child from camp. The officer responded that there were no cell phones allowed in the institution; Ms. O'Neill clarified that she was asking to use the officer's phone at the desk to make a call. The officer responded by saying "Do you know where you are? This is a jail. I understand your problem, but there's nothing I can do for you. I can't allow you to use the phone." The two asked whether the officer could contact someone from MDC Legal who could place the call to help arrange childcare for their children, and the officer responded no. Then the two asked to speak directly with someone from MDC Legal or to the Warden. The officer placed a call, appeared to have a conversation with someone, but did not permit the attorneys to speak to the phone call's recipient; when he hung up, the officer stated he had spoken with MDC Legal and that they said "the lawyers have to wait."

Shortly thereafter, the attorneys learned that this call to MDC legal was a sham. All five attorneys had approached the visiting room desk officers together to try to obtain information and make clear they needed to communicate with family members. During this conversation, the visiting room officer let it slip that he had not previously spoken with anyone from MDC legal, but instead he had called his supervisor, who said that "this is an institutional emergency, and the lawyers have to wait." When the lawyers asked what this meant, a second officer explained: "this is an institutional matter. Legal is Legal. We are institutional. This is an institutional matter. We can call Legal, but there's nothing they can do for you. Legal has no say in institutional

matters. You just have to wait." As the attorneys were walking away, they heard one of the officers say to the other: "What time is it? I don't think legal is still here."

Subsequently, another officer informed the attorneys that the emergency count had concluded, and they were waiting for it to be administratively cleared; when asked how long this would take, the officer responded "however long it takes." A second officer who had been entering and exiting the visiting room freely throughout this time said that it should not be too much longer. When the attorneys again asked to speak directly with someone at MDC Legal, they were told no and instructed to sit down.

The attorneys were finally released at approximately 3:35 pm. During the period in which they were detained, they had no access to water or food; they were refused communication with family, MDC Legal, and the Warden; and they were denied the ability to make emergency plans for their children. Some felt dizzy and unwell when they left. Others hurried to contact their partners and children to assure them they were safe and well and that their children were in safe hands. One attorney quickly placed a call to Judge Caproni's chambers, as she had missed a court conference that afternoon while detained in the visiting room.

On Friday evening, when Plaintiff learned what had happened, we immediately shared this information with the government and MDC, as well as with the mediation team. The MDC and the government have not responded.

But the denial of access nonetheless has continued unabated. On Sunday, July 17, 2022, two attorneys who attempted to visit their clients were thwarted.

One attorney arrived at 7:45 am, and after being processed, he was told by front desk staff that there was no staff in the visiting room. He waited 30 minutes, and then an officer came out of the sallyport, told the attorney to sit back down, took his visiting forms and went to the front desk. When the officer returned, she told the attorney that his clients were in quarantine. The attorney noted that both clients had already been housed at MDC for over a year, so it seemed unlikely they were in quarantine; the officer took the forms again and returned to the front desk. At approximately 9:10 am, two captains arrived in the front lobby, the lights flickered, and the attorney was told the power generator had "blown" and he would have to go to the East Building to see his clients. As the attorney stood in the East lobby waiting to be processed, the phone at the front desk rang, and the officer, after speaking briefly to someone on the phone, told the attorney that the count had begun and the attorney could not enter the institution until the count had cleared, which would not be until at least 11:00 am. The attorney left without seeing his clients.

A second attorney arrived at the West Building at noon and was first told that she had to go to the East Building to see her two clients because the power was out in the West Building. When she got to the East Building, she was told that all visits were cancelled. She asked to speak to a supervisor, and then was told that visits had reopened. But she was denied entry to the East visiting room by the lobby officer who opined that her (knee-length) skirt was too short. The attorney asked to see the Lieutenant. After waiting for 35 minutes, the Lieutenant came and said the skirt was fine and the attorney could go in to the visiting room. The attorney gave the visiting room officer her forms at 12:42 pm. The officer (Officer Ortiz) refused to take more than one form at a time. Her first client was not brought down until 2:08 pm. When the first client arrived,

KAPLAN HECKER & FINK LLP

4

the attorney asked if the officer could now call for the second client so that client could come down while she was meeting with the first client. The second client did not come down by 3:20 pm so the attorney left the visiting room before the afternoon count began and asked at the front desk about her second client. She was informed that she could not see the second client until 5:00 pm. The attorney returned to the MDC at 5:00 pm. She was told that she could see her client in the West Building but was required to wait in the lobby until 5:54 pm. She then was admitted into visiting room, and over six hours after first asking for her client to be called down, began her visit with her second client at 6:10 pm.

The Federal Defenders hopes and expects that Defendants will investigate these serious incidents and discipline the officers involved as appropriate.[1] But an investigation into individual incidents is not enough. After more than two years of weekly mediation sessions, during many of which Plaintiff has raised issues with legal access both at the height of the pandemic and since in-person visiting has reopened, MDC continues to violate the Sixth Amendment and plead in its defense some combination of "communication issues," "security incidents," and "staffing issues."

It is long past time for drastic change. We intend to discuss these and other issues during this week's mediation session, with the hope of understanding the institution's explanation for these violations and crafting long-term solutions to whatever led to them. But given the increasing frequency and severity of legal access being impeded by MDC, we wanted to notify the Court immediately of what occurred over the past several days.

We ask that the Court either advance this week's court conference to Wednesday, July 20, 2022 (following Tuesday's mediation session) or direct the MDC that from Monday, July 18, 2022 until the court can consider the matter more fully at the conference on Friday, July 22, 2022, the MDC (1) shall immediately inform the Court, the parties, and the mediation team of any lockdown or emergency count that lasts more than 30 minutes; (2) shall not leave any legal visitor locked in SHU for more than 30 minutes without an officer checking on that attorney; and (3) shall not prevent any legal visitor from speaking to MDC Legal or the Warden upon request. We anticipate seeking further relief from the Court at the next conference following Tuesday's mediation call.

We thank the Court for its continued attention to these important issues.

Respectfully submitted,

/s/ Sean Hecker
Sean Hecker

cc:  Counsel of Record (by ECF)
     Hon. Loretta Lynch, Paul, Weiss, Rifkind, Wharton & Garrison LLP (by e-mail)
     Roberto Finzi, Paul, Weiss, Rifkind, Wharton & Garrison LLP (by e-mail)
     Charlie Figueroa, Paul, Weiss, Rifkind, Wharton & Garrison LLP (by e-mail)

---

[1] The Federal Defenders will provide descriptions, and names where it has them, of the officers involved to the mediation team.